554 F.2d 310
 DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR, Petitioner,*
v.
PEABODY COAL COMPANY and Old Republic Insurance Company,
Respondents.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR, Petitioner,*
v.
SOUTHWESTERN ILLINOIS COAL CORPORATION, Respondent.
 Nos. 76-1577 and 76-1648.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 3, 1976.
Decided April 19, 1977.
 
 Mark E. Solomons, U. S. Dept. of Labor, Washington, D. C., for petitioner.
 John L. Kilcullen, Washington, D. C., Thomas Q. Keefe, East St. Louis, Ill., for respondents.
 Before PELL and SPRECHER, Circuit Judges, and DILLIN, District Judge.**
 PELL, Circuit Judge.
 
 
 1
 In as simple terms as are permitted where the ultimate decisional statement is necessarily dependent upon frequent references to multinumbered and alphabetized statutory provisions, much of these appeals is concerned with the fact that Congress provided for recovery of money by those suffering from black lung disease but in so doing the method of reducing claims to possession was by referring to an entirely different compensation statute which itself was amended subsequent to the black lung statutes. While we as the panel to which this case was assigned must accept responsibility for the opinion which follows, we regret having to answer for the embranglement which will face any reader but the most knowledgeable in this particular field of legislative endeavor as we attempt to wend our way through the daedalian verbiage here involved. The one clear aspect of these cases is that the resulting bureaucratic disagreements as to the correct solution of the issue resulting from the statutory shambles has successfully thus far thwarted the effective implementation of a societal program deemed essential by the Congress.
 
 
 2
 William Lowe, a coal miner, quit his employment with the Peabody Coal Company (Peabody) on January 9, 1974. He filed a claim for benefits under Part C of Title IV of the Federal Coal Mine Health and Safety Act of 1969, (FCMHSA) as amended by the Black Lung Benefits Act of 1972, 30 U.S.C. § 901 et seq. (1970 ed. and Supp. V, 1975,) on February 21, 1974. He died of "black lung and emphysema" on April 15, 1974. Ten days later, on April 25, 1974, Olga Lowe, his widow, filed her Part C claim for benefits.
 
 
 3
 Scott Vancil was employed for fifteen years or more in underground coal mines, leaving such employment in 1952 for road construction work. He filed a claim for benefits under Part B of the Act[1] on August 15, 1973.
 
 
 4
 These consolidated appeals present important questions regarding the administrative hearing upon the Lowe and Vancil claims. The hearing on the Lowe claims was conducted by Hearing Officer Nicodemo DeGregorio, who is not an administrative law judge appointed pursuant to 5 U.S.C. § 3105. For this reason Peabody objected to his authority to conduct the hearing. On March 19, 1976, the hearing officer issued a Decision and Order, ruling that William Lowe was totally disabled by pneumoconiosis at the time of his death, that his death was due to pneumoconiosis, and that Peabody was liable for the payment of benefits to Olga Lowe pursuant to the Act. Peabody appealed this decision to the Benefits Review Board (BRB). On April 19, 1976, the BRB vacated the hearing officer's decision on the ground that the hearing officer was not a duly qualified administrative law judge and remanded the case for a new hearing.
 
 
 5
 Similarly, the hearing on the Vancil claim was conducted by Hearing Officer Thomas G. Egan, who is not an administrative law judge appointed pursuant to 5 U.S.C. § 3105. For this reason Southwestern Illinois Coal Corporation (Southwestern) objected to his authority to conduct the hearing. On March 9, 1976, the hearing officer issued a Decision and Order, ruling that Scott Vancil was totally disabled due to pneumoconiosis arising out of his coal mine employment, that the provisions of § 422(f)(2) of the Act, 30 U.S.C. § 932(f) (2) (Supp. V, 1975), precluded Southwestern from being held liable for benefits, but that the Secretary of Labor was liable for the benefits due or to become due after January 1, 1974, under § 424 of the Act, 30 U.S.C. § 934 (Supp. V, 1975), as made applicable to the claim through § 415(a)(1), 30 U.S.C. § 925(a) (1) (Supp. V, 1975). The Director, Office of Workers' Compensation Programs, United States Department of Labor (Director), appealed this decision to the Benefits Review Board. The BRB vacated the hearing officer's decision on the ground that the hearing officer was not a duly qualified administrative law judge and remanded the case for a new hearing.
 
 
 6
 In both cases, the BRB relied upon its prior decision in Fields v. A.K.P. Coal Company, Inc., 3 BRBS 269 (1976), being reconsidered on other grounds. The BRB read the Fields decision as holding that in a case where a potentially responsible operator and/or carrier participate and where a well-founded objection to the qualifications of a hearing officer to conduct a formal hearing under the Act is made during the adjudication before that official, a Decision and Order based on that proceeding is invalid, because a hearing under the Act must be conducted by a qualified administrative law judge. Not only is the Fields decision the basis of the decisions rendered in the present cases, but it also figures in a continuing legal dispute between the United States Civil Service Commission (CSC) and the Department of Labor. Because of the peculiar interaction of that dispute with our disposition of the present petitions, it is appropriate to set forth a summary of that legal debate.
 
 
 7
 Approximately two months before the Secretary of Labor was to begin processing Part B and Part C black lung claims, a personnel officer in the Department of Labor submitted to the CSC's Office of Administrative Law Judges position descriptions for review and classification as Administrative Law Judge, GS-935. One of the descriptions was designed for cases arising under the Black Lung Benefits Act of 1972, P.L. 92-303. By a letter dated May 25, 1973, the Director of the CSC office opined that the CSC did not have jurisdiction to classify the requested positions as administrative law judges because the language of the incorporating clause in the Black Lung Benefits Act of 1972 (the amended FCMHSA) did not incorporate the subsequent October 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act (the amended LHWCA).
 
 
 8
 The CSC's initial response to the request for administrative law judges essentially rested upon its conclusion that, under a rule of statutory construction first recognized formally by the United States Supreme Court in Kendall v. United States ex rel. Stokes, 37 U.S. (12 Pet.) 524, 624, 9 L.Ed. 1181 (1838), and approved a century later in Hassett v. Welch, 303 U.S. 303, 314, 58 S.Ct. 559, 82 L.Ed. 858 (1938), an adopting statute takes the adopted statute as it exists at the time of adoption. The CSC noted that the black lung amendments had been enacted on May 19, 1972, and the LHWCA amendments were enacted some five months later, on October 27, 1972. The CSC concluded that there was no question but that prior to the October 1972 amendments to the LHWCA, hearings under the Federal Coal Mine Health and Safety Act of 1969 were not subject to the requirements of the Administrative Procedure Act. The CSC directed legal inquiry toward the question whether the language of the incorporating clause in the black lung amendments incorporated the subsequent amendments to the LHWCA and concluded that it did not.
 
 
 9
 In a letter dated June 14, 1973, the Solicitor of Labor challenged the conclusions of the CSC on the basis that the October 1972 amendments were applicable to and were adopted by the Black Lung Benefits Act of May 1972. Subsequently, on January 18, 1974, the Secretary of Labor himself addressed a letter to the Chairman of the CSC. The Secretary's letter observed that any substantial deviation from the adjudicatory scheme provided in the LHWCA could seriously jeopardize the appellate procedures provided for in that statute. His letter also noted that such deviation would make "the utilization of the statutory Benefits Review Board and the U.S. Court of Appeals for appellate purposes highly questionable."
 
 
 10
 Approximately one month later, on February 25, 1974, the CSC formally determined that it could not properly classify the hearing officer positions for black lung cases as administrative law judges. On March 7, 1974, Chairman Hampton sent to the Secretary of Labor still another letter explaining the CSC's position. The letter set forth once again the CSC's view that the adjudication of black lung cases was controlled by the provisions of the LHWCA as of the date the black lung amendments adopted the hearing procedures.
 
 
 11
 Up to this point, the dispute had focused on the hearing procedures. Because the Secretary of Labor was mandated to process black lung claims, the choice was made to amend the then-existing regulation requiring the use of administrative law judges in the adjudication of black lung claims so as to permit individuals other than administrative law judges appointed pursuant to 5 U.S.C. § 3105 to hear the claims. In February 1976, however, the BRB's Fields decision struck down as invalid the new, superceding regulations.
 
 
 12
 The Fields opinion found that the regulations authorizing non-administrative law judge hearing officers to conduct hearings under the Black Lung Benefits Act were in conflict with Section 19(d) of the Longshoremen's Act[2] and Section 559 of the Administrative Procedure Act.[3] One essential ground of its analysis was the BRB's conclusion that the May 1972 amendments incorporated the subsequent October amendments to the LHWCA. Thus, the BRB disagreed with a legal analysis which the CSC had consistently pressed for approximately three years.
 
 
 13
 The next stage in the disagreement between the CSC and the Labor Department soon developed. Subsequent to Fields, by a letter dated March 23, 1976, the Secretary of Labor pointed out his dilemma to the CSC's Chairman by explaining that so long as the Fields decision was in force and so long as no duly qualified ALJ's were permitted to conduct black lung hearings, it would be impossible for the Department of Labor to administer effectively the benefits program created by Congress.
 
 
 14
 The CSC's Chairman responded by a letter of July 6, 1976, escalating the initial dispute regarding the status of hearing officers to a jurisdictional question. The Chairman's letter first noted that the Fields discussion on the status of hearing officers was mere dicta inasmuch as the technical holding of the case was that the statute of limitations barred any successful claim against the employer/carrier. The Chairman then pointed out that the BRB had chosen to ignore a challenge to its own jurisdiction in Fields. Expressing once again the CSC's view that where one statute adopts the provisions of another by specific reference "such adoption takes the statute as it exists at the time of adoption and does not include subsequent modifications,"the Chairman explained that the CSC's 1974 decision that the October 1972 amendments did not have retroactive application to black lung cases was equally applicable to the jurisdiction of the BRB, which had been created by those amendments as the initial appellate tribunal for black lung appeals.
 
 
 15
 Our factual summary of the legal debate between the CSC and the Department of Labor establishes that a major question raised in the present cases deals with the thorny issue of reference legislation. The Director, Office of Workers' Compensation Programs, United States Department of Labor, has filed timely petitions for review,[4] asserting that jurisdiction resides in this court pursuant to § 21(c) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 921(c) (Supp. V, 1975),[5] as adopted by and incorporated into the Federal Coal Mine Health and Safety Act, §§ 415(a)(5) and 422(a), 30 U.S.C. §§ 925(a)(5)[6] and 932(a) (Supp. V, 1975).[7]
 
 
 16
 The respondents have not directly challenged the Director's assertion that § 21(c) of the amended (October 1972) LHWCA, 33 U.S.C. § 921(c) (Supp. V, 1975), vests this court with jurisdiction over the instant review petitions. In part at least, this omission stems from the unique adversarial posture in which they find themselves. As respondents, they must meet the Director's efforts to set aside the BRB orders. However, as petitioners in the review procedure leading to the instant orders, the mine operators reserved objections to the Board's jurisdiction. Their argument on the merits in this court indicates that they agree with the Board that the Secretary exceeded his statutory authority by designating hearing officers to conduct black lung cases but disagree with the BRB's premise that the October 1972 amendments were retroactively incorporated into the FCMHSA.
 
 
 17
 In what appears to be an effort to preserve a position taken as a party in interest before the BRB while supporting the BRB result with which they agree, the respondents filed in this court a motion to dismiss the Director's petitions. Omitting a direct challenge to this court's jurisdiction, the respondents directed their arguments in support of the motion at claimed violations of Rule 15(a), Fed.R.App.P., 33 U.S.C. § 921a (Supp. V, 1975), and 20 C.F.R. § 725.402(d). See notes 33, 34, 35 infra. Subsequently, by leave of court, the respondents filed a response to the Director's reply brief, arguing that the BRB has no jurisdiction over black lung cases and that its decisions in the two consolidated cases presented here have no legal force and effect. Generally speaking, the respondents' position on the question of BRB jurisdiction tracks the CSC analysis set forth above.
 
 
 18
 The threshold question in these cases being whether this court has jurisdiction to entertain petitions for review of BRB decisions in black lung cases, our responsibility to satisfy ourselves as to this court's jurisdiction requires us to resolve the thorny questions arising out of the Congressional attempt to legislate by reference by inquiring initially into the relation between § 422(a) of the amended (May 1972) FCMHSA, 30 U.S.C. § 932(a) (Supp. V, 1975), and § 21(c) of the amended (October 1972) LHWCA, 33 U.S.C. § 921(c) (Supp. V, 1975), rather than by inquiring into the related question concerning the relation between § 422(a) of the amended FCMHSA, 30 U.S.C. § 932(a) (Supp. V, 1975), and § 19(d) of the amended LHWCA, 33 U.S.C. § 919(d) (Supp. V, 1975). If the May 1972 amendments to the FCMHSA of 1969 did not incorporate the October 1972 amendments to LHWCA, this court does not possess the LHWCA § 21(c), 33 U.S.C. § 921(c) (Supp. V, 1975), jurisdiction which the Director asserts is the statutory basis for these petitions for review. We turn now to that important jurisdictional issue.
 
 
 19
 I. Appellate Review Under 33 U.S.C. § 921(c).
 
 A. Preliminary Comment
 
 20
 Initially, we note that the present cases do not involve a question of compensation awards to the employees directly covered by the new formulation of the LHWCA. In such cases, where there is no problem of reference legislation, the LHWCA directly confers review jurisdiction upon the courts of appeals. Prior to the October 1972 amendments, there was no administrative review procedure for claims. The cases were heard in the first instance by Deputy Commissioners and review was then had in the United States district courts.[8] See generally Pittston Stevedoring Corporation and the Home Insurance Company v. Dellaventura and Director, Office of Workers' Compensation Programs, U.S.D.L., 544 F.2d 35, 38 n.1 (2d Cir. 1976). At the date when the October 1972 amendments became effective, the adjudicative framework changed. All such cases were thereafter to be heard first by an administrative law judge, see note 2 supra, whose decisions were then subject to review by the BRB, with a further right to review in the courts of appeals by any aggrieved person.[9] See generally Barthelemy, Petitioner, and Director, Office of Workers' Compensation Programs, United States Department of Labor, Intervenor v. J. Ray McDermott & Company, Inc., 537 F.2d 168 (5th Cir. 1976).
 
 
 21
 Our resolution of the preliminary question of our review jurisdiction must necessarily turn upon a determination of the legal effect of the incorporating language employed in § 422(a) of the amended (May 1972) FCMHSA, 30 U.S.C. § 932(a) (Supp. V, 1975).[10] Unless we have review jurisdiction from BRB decisions in black lung cases, it is improper to consider the question of the particular hearing procedures which Congress has mandated or allowed. It is clear that Congress has expressly manifested its intent to incorporate substantive and procedural provisions of the LHWCA into the black lung benefits program. The legal wrangling which we have set forth above developed because of the lack of any legislative materials bearing on Congressional intent with respect to the applicability of the earlier or the amended provisions of that referenced statute.
 
 B. The Plain Language Approach
 
 22
 Ordinarily, in the absence of any legislative materials casting light upon a particular statutory problem, the desirable course is to begin analysis by recognizing that "(t)he starting point in every case involving construction of a statute is the language itself." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976), quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Powell, J., concurring.) In the instant cases, this method yields several important clues regarding the manner in which Congress approached the reference legislation here in issue but is insufficient alone to resolve the threshold jurisdictional question. Our inquiry into the actual wording of the incorporating clause of the black lung legislation must, of course, focus not on the abstract force of the words or what they may comprehend but rather "in what sense were they intended to be understood or what understanding do they convey as used in the particular act." 2A Sutherland Statutory Construction § 46.07, at 66 (4th ed. 1973).
 
 
 23
 The original version of § 422(a), as enacted on December 30, 1969,[11] is almost but not quite identical with the amended version.[12] The May 1972 amendments changed the dating from 1972 to 1973, deleted number "7" from the catalogue of excluded LHWCA provisions,[13] and deleted the qualifying phrase "an underground" with respect to the mines covered by the Act. These verbal changes do not relate directly to the review procedures subsequent to the initial hearing and yield little information regarding Congressional intent regarding the application of either the earlier or the amended LHWCA provisions.
 
 
 24
 Any attempt to discern Congressional intent by resort to the textual language of the pertinent incorporating section with its direct list of excluded LHWCA provisions and implicit reference to included LHWCA provisions leads almost immediately to an incredible muddle of technical mistakes. For instance, Congress expressly excluded both in 1969 and 1972 § 43 of the original LHWCA, 33 U.S.C. § 943 (1964 ed.). Yet that specific section had been repealed by the Act of November 8, 1965, P.L. No. 89-348, § 15, 79 Stat. 1311. Assuming that the Congressional oversight as to this particular LHWCA provision carried over to § 42 of the original LHWCA, 33 U.S.C. § 942 (1964 ed.), the incorporating clause of the original FCMHSA of 1969 could be read as adopting § 42 of the original LHWCA, even though that particular section was itself repealed by the Act of September 6, 1966. P.L. No. 89-554, § 8, 80 Stat. 647. Moreover, application of the text of either the original or reformulated versions of § 422(a) of FCMHSA, notes 11, 12 supra, leads inexorably to a holding that either the unamended § 5 of the LHWCA, 33 U.S.C. § 905 (1970 ed.), or the amended § 5 of the LHWCA, 33 U.S.C. § 905 (Supp. V, 1975), was or is incorporated into the black lung legislation, but that the original and never-revised § 4 of the LHWCA, 33 U.S.C. § 904 (1970 ed. and Supp. V, 1975), was or is expressly excluded. The formal incorporation of either version of the former section with the express exclusion of the latter section simply makes no rational sense by virtue of the vital interaction of the two sections.[14]
 
 
 25
 Further reading of the interplay between the LHWCA provisions taken into the FCMHSA statutory framework and the LHWCA provisions specifically excluded therefrom soon leads to other inexplicable results. In this respect, the plain language approach raises new questions rather than resolving those presented in the instant cases. Assuming arguendo that the necessary effect of adopting the provisions of an independent statute is that the incorporated provisions are always and automatically to be read as though "incorporated bodily into the adopting statute," Hassett, supra, 303 U.S. at 314, 58 S.Ct. at 564, it becomes quite difficult in many instances to discern exactly what the language of the FCMHSA really states. The frequency of direct statutory cross-referencing creates a number of interpretative problems which we need not directly confront. However, we must face the serious jurisdictional problems engendered by the unusual formulation of the language of both the 1969 and the 1972 versions of the "adopting" section.
 
 
 26
 The first sentence of the incorporating provision makes applicable to coal mine operators a number of LHWCA provisions. Congress accomplished a seemingly mandatory application of those referenced provisions by means of language expressly excluding specific LHWCA provisions. The last sentence of the incorporating provision authorizes the Secretary to prescribe additional provisions "not inconsistent" with the LHWCA sections which were specifically excluded.[15] The authorization of regulations consistent with the LHWCA provisions not taken bodily into the FCMHSA arguably warrants the conclusion that Congress intended to make applicable any LHWCA provisions which had any tendency to promote the speedy payment of benefits to claimants who were entitled to their receipt.
 
 
 27
 In any event, the explicit grant of power to the Secretary to deviate from the incorporated LHWCA provisions creates some problems. In point of fact, some of the included LHWCA subsections regulate the jurisdiction and procedure of the federal courts. We must recognize that authorizing the Secretary of Labor to reorient the division of judicial responsibilities is plainly unacceptable. "The political truth is, that the disposal of the judicial power (except in a few specified instances) belongs to Congress . . .." Sheldon v. Sill, 49 U.S. (8 How.) 441, 449, 12 L.Ed. 1147 (1850), quoting Turner v. Bank of North America, 4 U.S. (4 Dall.) 8, 10, 1 L.Ed. 718 (1799).
 
 
 28
 Because we cannot give full literal effect to the words appearing in the original and in the amended incorporating provision, we must turn to extrinsic aids to statutory construction as the fundamental means of resolving the jurisdictional question.
 
 C. Extrinsic Aids To Statutory Construction
 
 29
 The frequency of legislation by reference has resulted in the formulation of well-settled canons of statutory construction. A leading treatise points out that
 
 
 30
 (t)here are two general types of reference statutes: statutes of specific reference and statutes of general reference. A statute of specific reference, as its name implies, refers specifically to a particular statute by its title or section number. A general reference statute refers to the law on the subject generally.
 
 
 31
 2A Sutherland, supra at § 51.07, at 322. Moreover, the type of reference plays an important role, for
 
 
 32
 (W)hen a statute adopts the general law on a given subject, the reference is construed to mean that the law is as it reads thereafter at any given time including amendments subsequent to the time of adoption. This is to be contrasted with adoption by reference of limited and particular provisions of another statute, in which case the reference does not include subsequent amendments.
 
 
 33
 Id., quoting George Williams College v. Village of Williams Bay, 242 Wis. 311, 7 N.W.2d 891 (1943). Like most rules, the rule that general and specific legislative references have different legal effects is subject to an exception. As the Sutherland treatise explains, supra at § 51.08, at 324;
 
 
 34
 A statute of specific reference incorporates the provisions referred to from the statute as of the time of adoption without subsequent amendments, unless the legislature has expressly or by strong implication shown its intention to incorporate subsequent amendments with the statute. In the absence of such intention subsequent amendment of the referred statute will have no effect on the reference statute. (Emphasis supplied.)
 
 
 35
 In our view, the established canons of construction provide the means for resolving the jurisdictional question. If § 422(a) of the amended (May 1972) FCMHSA, 30 U.S.C. § 932(a) (Supp. V, 1975), is a general reference, this court possesses jurisdiction over the Director's review petitions. If the incorporating provision must be characterized as a specific and descriptive legislative reference, this court is without review jurisdiction. See generally Kendall, In re Heath, and Hassett, supra.
 
 
 36
 We must note at this point that the Director's suggestion that canons of statutory construction are frequently little more than a makeweight available to a court to reach a proper result impliedly invites this court to engage in judicial legislation. We decline to do so. While this court fully understands the reasons why a decisive resolution of the question of the proper hearing procedures for black lung cases is necessary and desirable, it cannot ignore either the controlling Supreme Court precedents relating to the rules of statutory construction or the serious question regarding the asserted jurisdiction under § 21(c) of the amended (October 1972) LHWCA, 33 U.S.C. § 921(c) (Supp. V, 1975).
 
 
 37
 The Director argues that the enactment of procedural amendments to an incorporated statute calls for application of the in pari materia canon to the present cases. If the incorporating section of the black lung legislation could be construed as adopting merely the procedural heart of the LHWCA, there might be a viable in pari materia argument. Because it is clear that both substantive and procedural LHWCA provisions have been expressly adopted, see, e. g., § 421(b)(2)(F), 30 U.S.C. § 931(b)(2)(F) (1970 ed. and Supp. V, 1975); see also Usery, supra 428 U.S. at 9n.8, 96 S.Ct. at 2889, we accept the respondents' argument that the in pari materia canon is not applicable to the instant cases.
 
 
 38
 Apparently assuming that the legislative reference is specific rather than general, the Director attempts to utilize the "express intent" or "strong implication" exception to the specific reference canon. He asks this court to resolve any statutory ambiguities in accord with the reasonably inferred purposes of the draftsmen of the statute. The Director's candid admission that there is no clear or express intent reflected in the legislative materials requires him to turn to the "strong implication" prong of the argument. Nonetheless, the opaque and unilluminating legislative materials still require him to ground the argument upon inferences and reasonable assumptions rather than upon direct implications. We cannot so cavalierly accept the Director's suggestion that "the rule of Hassett v. Welch . . . relied upon by the coal operators is properly discarded in the instant context . . .." We must recognize that an implication is quite distinct from an inference or an assumption.
 
 
 39
 Nevertheless, "(w)hen a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction. . . ." Willcox v. Consolidated Gas Company, 212 U.S. 19, 40, 29 S.Ct. 192, 195, 53 L.Ed. 382 (1909). Accordingly, we still must determine whether or not § 422(a) of the amended (May 1972) FCMHSA, 30 U.S.C. § 932(a) (Supp. V, 1975), is properly characterized as a general legislative reference. Our recognition that Congress may have intended to incorporate any appropriate LHWCA provisions may well mean that Congress really wanted to adopt the "general law" on the subject of workers' compensation.
 
 
 40
 D. 30 U.S.C. § 932(a) As General Or Specific Reference
 
 
 41
 Undoubtedly, Congress may employ a general reference when adopting statutory provisions set out in an independent statute. Indeed, Congress did so when it gave merchant seamen the right to sue for damages arising from death or personal injury caused by negligence. In Panama Railroad Company v. Johnson, 264 U.S. 375, 391, 44 S.Ct. 391, 68 L.Ed. 748 (1924), the Supreme Court declared meritless the employer's criticism of the amended Jones Act, 38 Stat. 1185, as amended by § 33 of the Act of June 5, 1920, 41 Stat. 1007, because it did not set forth the new liability rules but adopted them by a generic reference. The Panama Railroad Company court thought it readily understood that the "generic reference (was) . . . to the Employer's Liability Act of April 22, 1908, c. 149, 35 Stat. 65, (FELA, 45 U.S.C. § 56) and its amendments." Id. at 391-92, 44 S.Ct. at 396. Citing inter alia, Kendall and In re Heath, supra, the Court explained that "(t)his is a recognized mode of incorporating one statute or system of statutes into another, and serves to bring into the latter all that is fairly covered by the reference." Id. at 392, 44 S.Ct. at 396.
 
 
 42
 The "fair coverage" language of Panama Railroad Company does not coincide directly with the general reference canon set out in Sutherland, supra at § 51.07, at 322. Nor does Panama Railroad Company authoritatively delineate the precise factors which determine whether a legislative reference is to be deemed general ("generic") or specific (Hassett's "specific and descriptive"). The delineation of the two distinct types of legislative reference is not always a simple task, while the determination of the necessary legal effect of the application of the one or the other canon is fairly routine once the initial characterization task has been completed.
 
 
 43
 For instance, the actual facts of George Williams College, supra, demonstrate that a facially specific legislative reference may, in fact, constitute a general legislative reference. In that case, the Wisconsin Supreme Court had before it an instance of reference legislation wherein the state legislature had modified the scheme of procedure relating to the construction, repair, and assessment of costs for village sewers and drains. The Wisconsin court was clearly dealing with a statutory framework wherein the referenced law was referred to by specific section numbers.[16] Because the Wisconsin court was able to conclude that the legislature was adopting the "general law" on the subject of sewer assessments, it characterized the legislative reference as general rather than as specific. The surface specificity of the incorporating language dissolved upon close judicial scrutiny.
 
 
 44
 Because there is little federal decisional law pertaining to the problem of characterizing legislative references, we think it appropriate to direct close attention to what the Wisconsin Supreme Court actually did in George Williams College. We can hardly overlook the patent fact that the clear articulation by a recognized authority of the canons of construction applicable to cases such as the present relied upon George Williams College not only as the source for its observation that the two types of legislative reference have different legal consequences but for the very formulation of the rule. See Sutherland, supra at § 51.07, at 322.
 
 
 45
 Our recitation of the incorporation by reference dispute between the CSC and the Secretary of Labor sufficiently demonstrates that all parties to the legal wrangling originally assumed that the incorporating language of the FCMHSA must be viewed as a specific reference. It is likely that this same basic assumption continues to prevail in the many cases raising exactly the issues pressed in the instant cases.[17] In light of the fact that facially specific references can and sometimes do operate as general legislative references, it is our task to examine the soundness of this unexamined assumption.
 
 
 46
 Before turning to that task, we note that the Director concedes that Congress occasionally enacts "technically defective statutes" but contends that we "should assume that Congress knows what it is doing with such a well-known device as incorporation by reference." At this point we need only state that we find no basis for indulging in such an assumption upon the present record. Indeed, the express exclusion of a repealed LHWCA provision (i. e., section 43 of the original LHWCA), taken in conjunction with the inclusion of either the original or the amended § 5 of the LHWCA and the exclusion of the cross-referenced but never-revised § 4 of the LHWCA, 33 U.S.C. § 904 (1970 ed. and Supp. V, 1975), points to exactly the opposite assumption. We can reasonably draw the inference that Congress never did direct as careful attention as it should have to the specific numerical references.
 
 
 47
 Arguably, a finding to that effect would be sufficient warrant for a judicial determination that the facially specific legislative reference was, in actual fact, intended as a general one. Because, however, the legal effect of applying the appropriate canon of construction plays such a determinative role in the present cases, we think it expedient to canvass other salient legislative details. In that regard, we note that the parties have focused their merits argument almost solely on the question of the FCMHSA incorporation of § 19(d) of the amended LHWCA, 33 U.S.C. § 919(d) (Supp. V, 1975).[18] Their dispute over the validity of 20 C.F.R. § 715.101(a)(27)[19] surveys the grants of regulatory authority contained in §§ 415(b), 422(a), and 426(a) of the amended (May 1972) FCMHSA, 30 U.S.C. §§ 925(b),[20] 932(a),[21] and 936(a) (1970 ed. and Supp. V, 1975),[22] but neglects distinct mention of § 421(b)(2)(F) of the amended (May 1972) FCMHSA, 30 U.S.C. § 931(b)(2)(F) (1970 ed. and Supp. V, 1975),[23] which refers to promulgated regulations without any direct grant of regulatory authority. Moreover, the parties' assumption that the FCMHSA reference to the LHWCA provisions is specific has not been tested by any serious analysis of the interplay of the cross-referenced provisions. Specifically, we note that the parties have directed no attention whatsoever to the problem engendered by the FCMHSA incorporation of § 18(b) of the amended (October 1972) LHWCA, 33 U.S.C. § 918(b) (1970 ed. and Supp. V, 1975).[24]
 
 
 48
 Although we experience some hesitancy in focusing upon statutory sections which the parties themselves have not scrutinized or in relying upon canons of construction which the parties have apparently overlooked, we think it our task to determine the precise category of legislative reference general or specific into which the pertinent incorporating provision really falls.
 
 
 49
 1. 30 U.S.C. § 931(b) As Indicator Of General Reference
 
 
 50
 In Usery, supra 428 U.S. at 8, 96 S.Ct. at 2889, the Supreme Court indicated that Congress intended that Part C black lung claims be processed under an applicable state workmen's compensation law approved by the Secretary of Labor. In the absence of approved state programs, claims were to be filed with and adjudicated by the Secretary. Id. at 8-9. The Court observed, without detailed explanation, that the state compensation programs had to be approved under standards set forth in § 421 of the FCMHSA, 30 U.S.C. § 931 (1970 ed. and Supp. IV). See note 1 supra.
 
 
 51
 A close examination of the statutory language of the various subsections contained in Section 421 amply supports the observation that the basic thrust of legislative intent was to assure adequate compensation for total disability or death due to pneumoconiosis. Adjudication of black lung claims by the Secretary was only an interim measure, for Congress wanted adequate state programs eventually to take over the benefits program. Thus, by virtue of § 421(b)(1) of the amended (May 1972) FCMHSA, 30 U.S.C. § 931(b)(1) (1970 ed. and Supp. V, 1975),[25] Congress mandated the Secretary to publish and, where appropriate, to revise and republish a list of state workmen's compensation laws providing adequate coverage. Also, by virtue of § 421(b)(2)(F) of the amended (May 1972) FCMHSA, 30 U.S.C. § 931(b)(2)(F) (1970 ed. and Supp. V, 1975),[26] Congress authorized the Secretary to list as adequate a state law only if he found that its provisions, regulations or interpretations were consistent with the LHWCA provisions brought into the FCMHSA by the incorporating provision of § 422(a), 30 U.S.C. § 932(a) (1970 ed. and Supp. V, 1975), which was directly and expressly mentioned as applicable.
 
 
 52
 We have already noted that the language of the amended § 422(a) suggests an inference that Congress intended to make applicable any LHWCA provisions promoting the speedy payment of benefits to entitled claimants. In this respect, the statutory language of § 421(b)(2)(F) is even a stronger indicator of the basic legislative intent. Like the incorporating clause itself, § 421(b)(2)(F) authorizes the Secretary to promulgate necessary or appropriate regulations. That is, after setting up federal criteria which must in any event be met by state compensation laws (subparagraphs (A) through (E)), Congress indicated a basic test of "consistency" between state and federal law.
 
 
 53
 In our view, the legislative requirement of consistency rather than exact duplication of state law provisions and the LHWCA provisions raises some doubt as to whether the Congressional reference to the LHWCA was ever intended to constitute a formal adoption of those provisions. In their single-minded pursuit of the merits question, the parties have never attempted to explore fully the labyrinthine pathways set up by the numerous statutory cross-references. Nor have they attempted to establish any distinctions between a "referring," an "incorporating," or an "adopting" statute. Similarly, the leading treatise seemingly suggests that a "referring" statute almost invariably incorporates or adopts the provisions of a referenced statute. In light of an apparent consensus in that regard, we shall suppress our doubt regarding the formal adoption by the FCMHSA of the LHWCA provisions, even though the language of both § 421(b)(2)(F) and § 422(a) of the amended (May 1972) FCMHSA, 30 U.S.C. § 931(b)(2)(F) and § 932(a) (1970 ed. and Supp. V, 1975), suggests what might be deemed a mere conditional or tentative adoption.
 
 
 54
 Nonetheless, the clear suggestion that Congress wanted the LHWCA provisions brought over and into the FCMHSA system only if the adopted sections or subsections speeded or assured the compensation of entitled claimants under Part C is extremely relevant. As other courts have recognized, Congress was dissatisfied with the results obtained under the statute as originally enacted. In Talley v. Mathews, 550 F.2d 911, 915 (4th Cir. 1977) the court observed that
 
 
 55
 (i)t was felt that many miners and survivors of miners for whose benefit the Act had been passed were failing to qualify for benefits under applicable standards. In response to this situation, Congress amended the Act in 1972 in order to facilitate the ability of claimants to qualify for black lung benefits.
 
 
 56
 Whether the Congressional desire to facilitate qualification for benefits of miners or their survivors so blocked out any direct consideration of specific numerical LHWCA provisions as to make its enacted incorporating provision merely a reference to the general law on the subject of workmen's compensation probably cannot be determined merely through resort to a verbal focus on consistency rather than upon exact duplication.
 
 
 57
 We cannot fail to note, however, that the question of the applicability of the original or the amended LHWCA provisions plays an important role in the administration of the black lung benefits program, even apart from the question of which hearing officers are required for adversarial proceedings. If the Secretary does not know whether the original or the amended LHWCA provisions are the benchmark for the "consistency" between state and federal law he is required to maintain, he is obviously disabled from making the finding that Congress has set forth as a condition precedent for the listing of a state compensation law as providing "adequate coverage." In view of the clear legislative intent to facilitate rather than to impede the payment of claims, we cannot impute to Congress any desire to leave the Secretary guessing as to which formulation of the LHWCA provisions he should apply in making the required finding of consistency.
 
 
 58
 We recognize the force of the operators' potential argument (never made in view of their failure to consider § 421(b)(2)(F) of the amended FCMHSA) that Congress never disabled the Secretary from developing the required list because it established the old LHWCA provisions as the benchmark for his finding. Similarly, we recognize our duty to give more than mere lip service to the Supreme Court's recurring formulation of the canon respecting specific and descriptive legislative references. Accordingly, we must direct our inquiry to the serious LHWCA § 18(b) problem implicit in these and future cases. For in the course of close analysis of the links between the FCMHSA and the LHWCA, we have concluded that the cited subsection represents not only the strongest indication that the legislative reference was indeed general but also the major obstacle to that conclusion.
 
 
 59
 2. The Facial Incorporation Of § 18(b) Of The LHWCA
 
 
 60
 Section 18(b) of the LHWCA, 33 U.S.C. § 918(b) (1970 ed. and Supp. V, 1975),[27] was added to the Act by virtue of the Act of July 26, 1956, ch. 735, § 6, 70 Stat. 655. Essentially, the subsection deals with the collection of defaulted payments and the protection of the solvency of the special fund established by § 44 of the LHWCA (33 U.S.C. § 944.)[28] The text of the subsection authorizes the Secretary of Labor to bring subrogation suits in order to recover for the benefit of the LHWCA § 44 (33 U.S.C. § 944) special fund the amount of any default.
 
 
 61
 Indisputably, the express omission of § 18 of the LHWCA from the excluded list in both the original and reformulated "adopting" clauses of § 422(a) of the FCMHSA, see notes 11, 12 supra, creates the initial impression that § 18(b) of the LHWCA, 33 U.S.C. § 918(b) (1970 ed. and Supp. V, 1975), has been carried over into both the original and the reformulated FCMHSA. It is thus impossible to avoid the conclusion that the subsection was facially incorporated. Upon close analysis, however, it is readily obvious that it never made, and still makes, no rational sense to adopt or incorporate the referenced subsection in toto.
 
 
 62
 The statutory text of § 18(b) of the LHWCA, 33 U.S.C. § 918(b) (1970 ed. and Supp. V, 1975), authorizes the Secretary's subrogation suits for the benefit of the "special fund established in section 944 (of title 33). . . ." Yet both versions of the adopting clause in the FCMHSA (i. e., December 30, 1969, and May 19, 1972, formulations) specifically exclude § 44 of the LHWCA (33 U.S.C. § 944) from the black lung legislation. Making a mine operator liable for payment into a fund whose origin and purpose is completely extraneous to coal mining and which is specifically excluded from the FCMHSA makes no sense at all.[29] Because the Secretary of Labor pays miners' benefits out of appropriated funds which are legally distinct from the special LHWCA § 44 (33 U.S.C. § 944) fund, we think there never was nor is there now any solid reason for incorporating into either the original or the reformulated FCMHSA the LHWCA authorization for the Secretary's subrogation suits.
 
 
 63
 We are fortified in this conclusion by both legislative and administrative action. It would be presumptuous for this court to assume that Congress was not aware of the possibility that the Secretary might be required to pay benefits which were the direct liability of a mine operator. So acute was the awareness of the problem that Congress enacted section 424.[30] Both the original and the amended indemnification provision against defaulting mine operators accomplish for the black lung program what § 18(b) of the LHWCA, 33 U.S.C. § 918(b) (1970 ed. and Supp. V, 1975), once accomplished or now accomplishes for the longshoremen's and harbor workers' compensation program. We note that the October 1972 LHWCA amendments appropriated a sum of $2,000,000 which the Secretary was mandated to deposit immediately into the special fund. See § 44(e) of the amended (October 1972) LHWCA, 33 U.S.C. § 944(e) (Supp. V, 1975). Contrariwise, the May 1972 amendments to the FCMHSA appropriated to the Secretary such funds as might be necessary to carry out his responsibilities under the FCMHSA. See § 429 of the amended (May 1972) FCMHSA, 30 U.S.C. § 939 (Supp. V, 1975). Nowhere in the statutory framework is there any indication that the Secretary was to use LHWCA appropriations for FCMHSA purposes.
 
 
 64
 The Secretary's regulations are consistent with our conclusion that § 424 of the amended (May 1972) FCMHSA, 30 U.S.C. § 934 (Supp. V, 1975), rather than § 44 (special fund) of the amended (October 1972) LHWCA, 33 U.S.C. § 944 (Supp. V, 1975), appropriately controls the recapture of defaulted mine operator payments. Thus, 20 C.F.R. § 725.333(b)[31] has obviously been drafted in light of the language of the former rather than the latter statutory provision. Plainly, the regulation neither contemplates the payment of miners' benefits out of the special LHWCA § 44 (33 U.S.C. § 944) fund nor limits the Secretary's subrogation rights to a mere liability for payment into the fund. Whereas the text of § 18(b) authorizes the Secretary to enforce a liability of the employer for payment into the special fund, the pertinent language of 20 C.F.R. § 725.333(b) allows the Secretary to recapture the payments made pursuant to § 424 of the amended FCMHSA or defaulted LHWCA § 7 medical benefits.
 
 
 65
 Inasmuch as there never was any reason either in 1969 or in May 1972 to incorporate § 18(b) of the LHWCA, 33 U.S.C. § 918(b) (1970 ed. and Supp. V, 1975), while excluding from the FCMHSA the cross-referenced § 44 of the LHWCA, 33 U.S.C. § 944 (1970 ed. or Supp. V, 1975), our doubts about the formal adoption of referenced provisions are enhanced. If Congress had been directing close attention to the interplay of the LHWCA sections which were facially taken into or excluded from the FCMHSA, it no doubt would have recognized that some verbal modification of the exact language of § 18(b) was necessary in order to provide the Secretary with a suitable recapture procedure. In view of other imperfect links in the statutory scheme such as we have already noted, we are inexorably led to the conclusion that Congress directed no real attention to checking or cross-checking the links between the two statutes.
 
 
 66
 On balance, we are persuaded toward the view that § 422(a) of the amended (May 1972) FCMHSA, 30 U.S.C. § 932(a) (Supp. V, 1975), is a general reference masquerading as a specific and descriptive reference. Hesitating to attach controlling significance to consideration of the irrational links between the two statutes, we think it expedient to follow the sage advice of Justice Holmes and to avoid the Scylla of imputing to Congress an intent to adopt extraneous and irrational provisions while also ensuring that we do not fall into the Charybdis of blatant judicial legislation. Cf. Interstate Consolidated Street Railway Co. v. Commonwealth of Massachusetts,207 U.S. 79, 86, 28 S.Ct. 26, 52 L.Ed. 111 (1907).
 
 
 67
 Accordingly, though we see no reason at all for incorporating LHWCA § 18(b) into the FCMHSA while simultaneously excluding the internally cross-referenced LHWCA § 44, we shall respect the presumed integrity of legislative processes by holding that both versions of the FCMHSA incorporating clause do adopt and incorporate that subsection. Such a holding is in no way inconsistent with our conclusion that the Congressional failure to check and cross-check the consequence of each and every LHWCA inclusion and exclusion, a number of which present major construction problems, warrants the judicial ruling that the legislative reference is general. We are persuaded that a court does not overstep the legitimate boundaries of its essentially adjudicative function by resorting to the established canons of construction in order to arrive at the legislative intent of technically defective draftsmanship.
 
 
 68
 At this point, however, we must note that our characterization of § 422(a) of the amended (May 1972) FCMHSA, 30 U.S.C. § 932(a) (Supp. V, 1975), as a general legislative reference does raise a different problem, again unnoticed by the parties. As previously noted, the distinctive legal effect of a general legislative reference is that subsequent amendments to the incorporated statutory provisions are read into the adopting statute. In the present cases, the major obstacle to the characterization of the pertinent incorporating provision as a general one is the possibility that the Ninety-Second Congress has effectively transformed the usual and customary allocation of judicial business by making this court one of original jurisdiction.
 
 
 69
 As we have noted, our threshold task (and unfortunately for the reader we are still at the threshold) is to determine whether this court possesses review jurisdiction. The text of § 18(b) of the LHWCA, 33 U.S.C. § 918(b) (1970 ed. and Supp. V, 1975), contains a direct and specific reference to the very subsection which the Director asserts as our jurisdictional basis. Because the language of § 18(b) has not been amended since its insertion into the LHWCA over twenty years ago, we face no problem as to whether its unamended or amended version is to be controlling. We think it clear that the original Congressional intent lying behind the phraseology allowing "a proceeding in the name of the Secretary of Labor under section 918 of this title or under subsection (c) of section 921 of this title, or both " contemplated maintaining the Secretary's subrogation suits in the federal district courts.
 
 
 70
 The October 1972 amendments to the LHWCA created the Benefits Review Board. See note 9 supra. The addition of a new subsection necessitated a relabeling of the remaining subsections. Thus, former subsection (c) became the new subsection (d). The text of new § 21(d) of the amended (October 1972) LHWCA, 33 U.S.C. § 921(d) (Supp. V, 1975), is identical with the text of old § 21(c) of the LHWCA, 33 U.S.C. § 921(c) (1970 ed.).[32] Yet Congress inexplicably neglected to modify in any respect the language of the old § 18(b) of the LHWCA, 33 U.S.C. § 918(b) (1970 ed. and Supp. V, 1975). A literal reading of the reformulated LHWCA, 33 U.S.C. § 901 et seq. (1970 ed. and Supp. V, 1975), thus gives the impression that the Secretary's subrogation suits can be maintained in either the federal district courts or the courts of appeals. And the pertinent administrative regulation, viz., 20 C.F.R. § 725.333(b), see note 31 supra, is also susceptible to the interpretation that the courts of appeals are a proper tribunal for the recovery of defaulted payments.
 
 
 71
 Obviously, Congress made a technical mistake with respect to the October 1972 LHWCA amendments. It left unmodified the cross-referencing language of § 18(b) (i.e., "under subsection (c) of section 921 of this title, or both") at the very time it was assigning new letters to the subsections of § 21 of the LHWCA, 33 U.S.C. § 921 (Supp. V, 1975). There is absolutely no reason for thinking that Congress wanted the courts of appeals to exercise original jurisdiction in the Secretary's subrogation suits for the benefit of the special fund regulated under § 44 of the LHWCA (33 U.S.C. § 944). The only realistic reading of the amended (October 1972) LHWCA, 33 U.S.C. § 901 et seq. (1970 ed. and Supp. V, 1975), requires a substitution of the correct subsection letters. Thus, a court must respond to the Congressional oversight by reading § 18(b) of the LHWCA, 33 U.S.C. § 918(b) (1970 ed. and Supp. V, 1975), as authorizing subrogation suits "under section 918 of this title or under subsection (d) of this title, or both. . . . "
 
 
 72
 Similarly, the Secretary's formulation of 20 C.F.R. § 725.333(b) also fails to deal with the Congressional failure to rewrite § 18(b) so as to conform its language to the distinct subsections of the new LHWCA § 21. The administrative failure to focus any attention at all upon the problem is also inexplicable. Inasmuch as the Secretary and the Director have consistently adhered to the view that the amended provisions of the LHWCA rather than the earlier formulations were operative, the administrative refusal or neglect to make the suggested correction could indicate a view that the Secretary thinks that the courts of appeals are appropriate tribunals to hear the Secretary's subrogation suits. In view of the normal distribution of trial and appellate responsibilities and in view of the complete absence of any legislative history demonstrating Congressional intent to assign basic trial responsibilities to the various courts of appeals, we are not inclined so to rule.
 
 
 73
 Nonetheless, the internal cross-referencing within the amended LHWCA seems to give the Secretary an option ("or both") of maintaining subrogation suits either in the federal district courts or in the courts of appeals. However, we think it so obvious that the never-revised § 18(b) must now be read as cross-referencing subsection (d) of the amended (October 1972) LHWCA, 33 U.S.C. § 921(d) (Supp. V, 1975), that we shall read the statute in that fashion. That being done, there is no real problem that the amended (May 1972) FCMHSA, 30 U.S.C. § 901 et seq. (1970 ed. and Supp. V, 1975), or the amended (October 1972) LHWCA, 33 U.S.C. § 901 et seq. (1970 ed. and Supp. V, 1975), vests the courts of appeals with original jurisdiction in subrogation suits. Instead, the problem is whether our substituted and obviously correct reading of the cross-referencing internal to the LHWCA comports with the traditional limits on judicial action.
 
 
 74
 This additional cross-referencing mistake internal to the October 1972 LHWCA amendments not only illuminates the fundamental soundness of the canon of construction first adopted by the Supreme Court in Kendall, supra, and subsequently reaffirmed both In re Heath and Hassett, supra, but presents a situation wherein it must be allowed to operate. In sum, application of the canon that a "specific and descriptive" reference takes the referred-to provision in its unamended formulation corrects the Congressional failure to modify the language of § 18(b) of the LHWCA, 33 U.S.C. § 918(b) (1970 ed. and Supp. V, 1975), without intruding the court into the legislative process.
 
 
 75
 For the reasons set forth in part I of this opinion, we hold that this court has jurisdiction over the Director's petitions for review by virtue of § 21(c) of the amended (October 1972) LHWCA, 33 U.S.C. § 921(c) (Supp. V, 1975). We turn now to the distinct question whether the Director is a proper party-petitioner.II. The Director As A Party-Petitioner
 
 
 76
 A second major issue in these consolidated cases is whether the Director is a proper party-petitioner. As previously noted, the operators/ carrier respondents earlier filed a motion to dismiss, arguing that the Director's failure to name the BRB as respondent contravened the requirement of Rule 15(a), Fed.R.App.P.,[33] 33 U.S.C. § 921a (Supp. V, 1975),[34] and 20 C.F.R. § 725.402(d).[35] On September 15, 1976, a single judge of this court, subsequently assigned as a member of this panel, denied the motion without opinion. In their argument to the merits, however, the operators/ carrier respondents renew the argument. Inasmuch as the reported decisions indicate that the courts of appeals have adopted disparate analyses of the problem, we think it necessary to set forth our reasons for allowing the Director's petitions for review in the instant cases.
 
 
 77
 Because the question of allowing either the BRB or the Director to appear as a respondent, as amicus curiae, or as a Rule 24(b) permissive intervenor is not squarely before the court at this time, there is no need to rule formally on those issues. Nonetheless, the distinct question of the propriety of allowing the Director to appear as party-petitioner bears a close relationship to those unsettled questions.
 
 A. The BRB As Respondent
 
 78
 A number of reported decisions have focused on the question whether the Benefits Review Board should be a party-respondent in a 33 U.S.C. § 921(c) review proceeding. The opinions in those cases have grappled with the unusual formulation of the statutory section and have pointed in different directions. Of the courts of appeals facing the question, all but the Second Circuit generally agree that the BRB is not a proper respondent. See, e.g., I.T.O. Corporation of Baltimore and Liberty Mutual Insurance Company v. Benefits Review Board, United States Department of Labor & Adkins, 542 F.2d 903 (4th Cir. 1976) (en banc), cert. filed, 45 U.S.L.W. 3417 (November 24, 1976) (No. 730); Nacirema Operating Co., Inc. v. Benefits Review Board, 538 F.2d 73 (3rd Cir. 1976); Offshore Food Service, Inc. and Aetna Casualty Surety Company v. Benefits Review Board, 524 F.2d 967 (5th Cir. 1975); McCord v. Benefits Review Board, United States Department of Labor and Cephas, 168 U.S.App.D.C. 302, 514 F.2d 198 (1975). The Second Circuit, like the First, has not found it necessary to rule on the question.[36] However, in a scholarly note outlining the contours of the problem, Judge Friendly, in Pittston Stevedoring Corporation, supra, 544 F.2d at 42 n.5, suggested that "the BRB is the proper agency respondent for review in the court of appeals, although the Solicitor of Labor could be designated to represent it." Technically, Judge Friendly's suggestion was dictum, inasmuch as the panel "deem(ed) it best to defer resolution of this question to a case where decision on this point is essential . . .." Id. However, we think it an important dictum. Hopefully, the Secretary will follow Pittston's suggestion that the Department of Labor "tidy up its regulations."
 
 B. The Director As Respondent
 
 79
 The distinct question whether the Director is a proper respondent, as opposed to the BRB, has also drawn different responses. In I.T.O., supra at 909, the Fourth Circuit, sitting en banc, ruled that it would stand firm in its conclusion that "the Director is not automatically a respondent in a review proceeding under § 921(c)." It elaborated on a comment made in the earlier panel opinion, see 529 F.2d 1080, 1089, that it was not deciding that "a court of appeals may not, in a proper case, permit intervention by others (including the Director) who have an interest at stake . . .." 542 F.2d at 909. For some reason left unexpressed, the en banc court deleted the panel's assertion that it was not deciding that a court of appeals may not allow others to "appear as petitioners or respondents as their interests appear." 529 F.2d at 1089. Clearly, however, the full court did rule, as had the panel, that neither the BRB nor the Director were proper parties to a § 921(c) proceeding.[37] It indicated a willingness to allow permissive intervention, signalling that a Fed.R.Civ.P. 24(b) motion would ordinarily be granted, but effectually ruled that only through the grant of such a motion could the Director properly participate in a 33 U.S.C. § 921(c) review proceeding. See id. at 909.
 
 
 80
 Assuming that the Fifth Circuit became aware of the en banc I.T.O. opinion prior to its decision in Jacksonville Shipyards, Inc., and Aetna Casualty & Surety Company v. Perdue and Director, Office of Workers' Compensation Programs, United States Department of Labor, 539 F.2d 533 (5th Cir. 1976), another approach to the problem appears. The Ayers Steamship Company petitioners, as parties to one of the five consolidated cases, alleged in their brief that the Director was not a proper respondent in the court of appeals, although he could appear as amicus curiae.[38] Essentially, the petitioners were seeking as relief the dismissal of the Director as a party and his addition as amicus curiae. However, they had not earlier sought this relief by a motion pursuant to Rule 27, Fed.R.App.P. Moreover, another panel of the Fifth Circuit had already granted motions by the Director to be added as a party-respondent. Because of the procedural history, the Jacksonville Shipyards panel ruled:
 
 
 81
 These legal determinations that the Director may properly appear as a respondent must be respected by this Court. As a general rule, one panel cannot overrule the precedents set by another panel, absent some intervening factor such as a new controlling decision of the Supreme Court. See Davis v. Estelle, 529 F.2d 437, 441 (5th Cir. 1976). No such factor is present in this case, and we will therefore allow the Director to remain before this Court as a respondent.
 
 
 82
 539 F.2d at 546.
 
 
 83
 The import of the panel's language is fairly clear. It recognizes as a precedent of the other panel the legal determination that the Director could appear as a party-respondent. However, the entire discussion clearly suggests that the panel, having been informed by counsel that the Fourth Circuit would allow neither the BRB nor the Director to appear as a party-respondent, entertained serious doubt about the correctness of the legal determination rendered by the other panel. Allowing the Director to remain as a respondent under such circumstances was an appropriate ruling, but the unique procedural facts tend to diminish its precedential value.
 
 
 84
 Similarly, this court allowed the Director to appear as a respondent in DuPuy v. Director, Office of Workers' Compensation Programs, United States Department of Labor, 519 F.2d 536 (7th Cir. 1975), cert. denied, 424 U.S. 965, 96 S.Ct. 1459, 47 L.Ed.2d 732 (1976). In that case, there was neither a motion to amend the caption nor a motion to dismiss the Director as the named respondent in the case and the question raised in other courts was not given consideration.
 
 C. The Director As Petitioner
 
 85
 We are advised of but three cases wherein the Director has been allowed to proceed as a petitioner under § 21(c) of the amended (October 1972) LHWCA, 33 U.S.C. § 921(c) (Supp. V, 1975).[39] Conversely, there are two cases wherein, by dictum and by holding, the opposite result was reached. We turn to an analysis of the cases.
 
 
 86
 In Director, Office of Workers' Compensation Programs, United States Department of Labor v. Cephas, 174 U.S.App.D.C. 302, 532 F.2d 1377 (1976), the published caption indicates that the Director's review petition was entertained. The case was a continuation of the judicial review first initiated in McCord, supra, 168 U.S.App.D.C. 302, 514 F.2d 198. Procedural rulings in connection with the proceedings do not appear within the later-published opinion. However, a footnote in the earlier McCord opinion, 514 F.2d at 199 n.1, explains that the Director's petition for review of the BRB order under challenge had been consolidated with the McCord petition. Although the court of appeals could have resolved the legal question by virtue of the employer's petition alone, it did not take action to dissolve the order of consolidation nor to dismiss the Director's distinct petition. Thus, the procedural history of McCord establishes that the District of Columbia Circuit has allowed the Director to maintain review petitions.
 
 
 87
 More recently, in Director, Office of Workers' Compensation Programs, United States Department of Labor v. Boughman, 545 F.2d 210 (D.C.Cir. 1976), the court again allowed the Director to prosecute a petition for review. The court's opinion contains no discussion of the propriety of such action. As in the procedural context of McCord and Cephas, supra, the review petition was consolidated with one pressed by other petitioners. Indeed, the legal argument presented by the Director was also pressed in the consolidated case, International Union of Operating Engineers and The Travelers Insurance Company v. Boughman and Director, Office of Workers' Compensation Programs, United States Department of Labor, 545 F.2d 210 (D.C.Cir. 1976). By entertaining the Director's review petition, the court manifested its adherence to the view that, at least where other parties in interest are also present before the court, the Director is a proper party-petitioner.
 
 
 88
 In Director, Office of Workers' Compensation Programs, United States Department of Labor v. O'Keefe, 545 F.2d 337 (3d Cir. 1976), the court passed upon a question regarding limitations of weekly death benefits payable under § 9 of the amended LHWCA, 33 U.S.C. § 909 (Supp. V, 1975). The court directed no attention to the question of the propriety of allowing the Director to maintain a review petition, merely confining its discussion to the following assertion:
 
 
 89
 This petition for review was filed by the Director from the final decision of the Benefits Review Board. Our jurisdiction is predicated upon 33 U.S.C. § 921(c) (Supp.1976). (Footnote omitted.)
 
 
 90
 545 F.2d at 339. Although there is no question that the O'Keefe court allowed the Director to maintain a petition for review, even though no other party in interest before the BRB appears to have sought judicial review, its precedential value is eroded by the absence of any focused attention to the problem. We are buttressed in our conclusion that O'Keefe does not represent an articulation of the full views of the Third Circuit by the express unwillingness of another panel to apply its implicit ruling to a case squarely raising the question.
 
 
 91
 The three aforementioned cases have reached a result without setting forth a rationale. Conversely, in the en banc I.T.O. case, we encounter a rationale where no direct ruling resulted. In dictum, that case noted, 542 F.2d 903, 908 n.5:
 
 
 92
 While the Director here seeks to be named a respondent to a petition for review, a holding that he is a "person aggrieved" whose presence insures proper adversity would necessarily lead to the conclusion that he is entitled to petition for review of a decision of the Benefits Review Board of which he disapproves: if the Director has an interest in sustaining a Board decision with which he agrees then he also has an interest in overturning a decision with which he disagrees. We would not readily subject the LHWCA to a construction under which the official charged with administering the Act could invoke the aid of the federal courts to reverse the decision of the board responsible for adjudicating claims under the Act. The unfairness of such a result is manifest if one contemplates the possibility that in some future case the Director in furtherance of his asserted interest in determining "the proper scope of coverage of the Act," might seek to reverse an award to a claimant on the ground that the Board had been too generous. (Emphasis in original.)
 
 
 93
 If the Fourth Circuit converts into a holding what it has already stated as dictum, the Director's attempt to set aside BRB orders of vacation almost exactly identical to those entered in the Lowe and Vancil proceedings will be met by an order dismissing the review petitions for want of standing.
 
 
 94
 The validity of this prediction is supported by Director, Office of Workers' Compensation Programs, United States Department of Labor v. Rochester & Pittsburgh Coal Company and Old Republic Insurance Company, Nos. 76-1828 and 76-1868 (3d Cir. January 17, 1977). In those consolidated cases, which raised exactly the same issue as here presented, the court held that the Director lacked standing to prosecute the petitions for review. The panel's dismissal of the petitions rested in part on the decision of the en banc I.T.O. court dismissing the Director as a party-respondent for lack of standing under the LHWCA.
 
 
 95
 Because our decision to follow the D.C. Circuit and the O'Keefe panel of the Third Circuit rather than the dictum of the Fourth Circuit and the holding of the Rochester Coal Company panel creates a clear conflict among the circuits, we think it appropriate to point out our reasons for allowing the Director to prosecute the instant review petitions. That task can be most easily fulfilled by recounting the reasons why we cannot accept as compelling the rationale upon which the Rochester Coal Company panel rests its standing decision.
 
 
 96
 In that case, the Director claimed to be a person "adversely affected or aggrieved," see note 5 supra, by the BRB order, in that he was obligated by reason of his secondary liability under § 424 of the amended (May 1972) FCMHSA, 30 U.S.C. § 934 (Supp. V, 1975), to pay benefits to the claimants Leonard Conrad and Stanley Solarczyk. See slip op. at 5; see also note 30 supra. Secondly, he contended that the pervasiveness of his interest in securing prompt and effective implementation of the Black Lung Act, including the achievement of an interpretation of the legislation which he considered fair and correct was sufficient to confer standing. See slip op. at 5.
 
 
 97
 The Rochester Coal Company panel rejected both contentions in ruling that the Director had no standing to maintain the review petitions. As to the "secondary liability" argument, it noted that the Secretary was subject to a liability for payments only when the claimant "is entitled to benefits." Slip op. at 5. Explaining that the awards had been vacated by the BRB because of the asserted lack of proper qualification of the hearing officers, the panel stated that
 
 
 98
 (c)laimants are not, therefore presently entitled to payment of benefits under the Act, and the Director cannot confer standing upon himself by this gratuitous payment of benefits to the claimants below.
 
 
 99
 Id. As to the "duty of administration" contention, the panel determined that the Director's duties of administration of the statutory program would not alone supply the distinctly personal interest which had been adversely affected by the decision of the BRB. Id. at 9. (Emphasis supplied.)
 
 
 100
 We find the Rochester Coal Company reasoning unpersuasive as to both prongs of the standing argument.
 
 
 101
 As to the secondary liability argument, we simply cannot agree with the Third Circuit panel that the argument was clearly lacking in merit. See slip op. at 5. First, we cannot understand how the panel could determine that the claimants Conrad and Solarczyk were not presently entitled to the payment of benefits without making at least an implicit ruling on the merits of the BRB's order of vacation which the Director was seeking to challenge. It seems clear to us that if the BRB was wrong in vacating the compensation awards to the claimants under its Fields dictum and if the hearing officers' orders were correct both as to the law and the facts, then the miners were presumptively entitled to benefits under the amended (May 1972) FCMHSA. See, e. g., note 12 supra; see also note 30 supra. In our view, the determination that the Secretary's payments were "gratuitous" necessarily carries the implication that the BRB's order of vacation was within its jurisdiction and legally correct.
 
 
 102
 We note that the procedural history of the Conrad and Solarczyk claims appears to be identical with the Lowe claims raised in the instant cases. However, Vancil's Part B claim stands in a somewhat different posture. Hearing Officer Egan's order and decision set forth as one conclusion of law that
 
 
 103
 (t)he Secretary of Labor is liable for the payment of such benefits due or to become due after January 1, 1974, under Section 424 of the Act as made applicable to this claim through section 415(a)(1).
 
 
 104
 By continuing the payment of benefits to Vancil the Secretary is not fostering a situation whereby the Director is attempting to "confer standing upon himself." See slip op. at 5. In connection with these particular payments, it is clear that continuance of the payments represents compliance not merely with the legislative mandate but the very terms of the initial order and decision. Here, by way of contrast with the procedural history disclosed in Rochester Coal Company, the Director filed a notice of appeal from the Hearing Officer's initial order and decision. Compare Joint Appendix at 47, with slip op. at 6.
 
 
 105
 Of course, the distinguishing fact of a notice of appeal from the hearing officer's initial ruling really is not all that important. The record establishes in the present cases that just as Southwestern has paid no benefits to Scott Vancil, Peabody has not paid any benefits either to the estate of William Lowe or to Olga, his widow. Under § 424 of the amended (May 1972) FCMHSA, 30 U.S.C. § 934 (Supp. V, 1975), see note 30 supra, the Secretary's payment obligation has been triggered. We do not think the Secretary was free to interpret the BRB's action of vacating the award as "eliminating, at least temporarily, any remaining possibility of secondary liability on the part of the Secretary." Slip op. at 6. If the BRB's order was correct in law, there would be some basis for this temporary elimination analysis. But that is precisely the point which the Director seeks to have determined on the merits.
 
 
 106
 Moreover, we do not think that Rochester Coal Company's implicit suggestion that the BRB's order of vacation has some determinative legal impact gives sufficient weight to the last two sentences of § 21(b)(3), see note 9 supra, or the last three sentences of § 21(c) of the amended (May 1972) FCMHSA, see note 5 supra. The practical impact of an order of vacation or the grant of a stay of payment of benefits is exactly the same. Congress has clearly mandated that the payment of the amounts required by an award should not be stayed by the BRB, see note 9 supra, or by the courts of appeals, see note 5 supra, unless the employer has shown irreparable damage. Indeed, the courts of appeals can order a stay of payment only by setting forth an express finding of irreparable injury to the employer. See note 5 supra.
 
 
 107
 In our view, the Rochester Coal Company decision does not direct sufficient inquiry to the practical equivalence of an order of vacation and a stay order. Its language stating that Conrad and Solarczyk are not entitled to benefits undercuts the effectiveness of the legislative proscription of improvident stay orders and further suggests that the Director should accede to the BRB's view that an order vacating the hearing officer's initial ruling was proper. We fully recognize that the BRB has been empowered to determine finally for the Department of Labor appeals raising a "substantial" question of law. See note 35 supra. Nonetheless, any characterization of the payments as so "gratuitous" as to vitiate the Director's standing inexorably brings into the standing equation the basic merit issues which the parties have been pressing upon the courts of appeals. The question of the legal correctness of the BRB's orders, all formally premised on Fields, supra, necessarily raises the difficult issues of reference legislation and the jurisdiction of the courts of appeals as well as of the BRB.[40] We are simply not persuaded that ruling on the "secondary liability" argument can avoid adjudicating the merits question. The intermeshing of standing, jurisdiction, and the merits in the instant cases is somewhat unusual. The peculiar nature of the present cases bears some relevance to the second aspect of the standing argument, which the Rochester Coal Company court regarded as "(a) more substantial argument in support of (the Director's) standing . . . contention . . .." Slip op. at 7.
 
 
 108
 As to the second prong of the Director's standing argument, we perceive the "duties of administration" issue quite differently than do the Fourth Circuit and the Rochester Coal Company panel.
 
 
 109
 Like the Fourth Circuit, we do not readily subject the amended (October 1972) LHWCA to a construction under which the Director has almost full freedom to invoke the judicial power of the courts of appeals in reversing decisions of the BRB. We need not confront the possible future case which the Fourth Circuit has posited, see 542 F.2d at 908 n.5, in ruling, as we do, that under the circumstances of the present cases, the Director has a sufficient interest in reversing the BRB's decision to be a proper party-petitioner. If the Director ever seeks to upset a BRB order which he thinks is overly generous, we will be called upon to state our views in that connection. The present petitions arise under entirely different circumstances.
 
 
 110
 We have no hesitancy in agreeing that the Director must have "some concrete stake in the outcome of the case." I.T.O., supra at 907; Rochester Coal Company, supra at 9. We need not determine whether the panel decision imposes too stringent a standing requirement by insisting that the Director demonstrate a "distinctly personal interest." Rochester Coal Company, supra at 9. (Emphasis in original.) For we are persuaded that the Director has both a concrete stake in the outcome and a distinctly personal interest.
 
 
 111
 As we have previously pointed out, see text and note at note 26 supra, the Secretary of Labor has been directed by Congress to assess the adequate coverage of state workmen's compensation laws by making a finding of consistency between their procedures and those set forth in the incorporated LHWCA. So long as the Secretary or his designated officials do not know whether the original or the amended LHWCA provisions are applicable, they are almost totally disabled from performing an administrative task which Congress has expressly mandated. Neither the Fourth Circuit nor the Rochester Coal Company panel have noted that the Congressional intent that adequate state programs eventually supplant the interim federal responsibility for payments will be totally frustrated if the incorporation by reference question presented in the Director's review petitions is left unresolved. In our view, the basic question in the cases is not merely the "substantial question of law" which 20 C.F.R. § 725.402(d), see note 35 supra, has left to the BRB but is one which is absolutely crucial to the administration of the benefits program which Congress intended. Thus, even apart from the readjudication of the claims initially heard by hearing officers not appointed under 5 U.S.C. § 3105, the whole transitional nature of the Part B-Part C statutory interface will be disrupted by a restrictive standing ruling. Reading Usery as we do, see note 1 supra, we decline to follow such an approach.
 
 
 112
 Accordingly, we hold that the Director, under the unique circumstances here present, has standing to appear as a party-petitioner in the instant cases. Although no claimants have appeared as parties, we have found sufficient adversity between the present parties to insure proper litigation. See McCord, supra, 514 F.2d at 200. Because the continuance of payments cannot fairly be characterized as "gratuitous," the Director's attempt to set aside an erroneous BRB ruling which now can be reviewed in no other fashion, the claimants no longer being able to file a timely petition for review, sufficiently relates to distinctly personal administrative functions as to warrant the prosecution of the instant cases. We find it unnecessary to explain the manner in which the deficient formulation of the new § 21(c) of the amended (October 1972) LHWCA, 33 U.S.C. § 921(c) (Supp. V, 1975), has caused these standing difficulties. See generally Pittston, supra, 544 F.2d at 42 n.5; I.T.O., supra, 542 F.2d at 906-08.[41]
 
 III. The Merits
 
 113
 We turn now to the merits.[42] Essentially, two major questions emerge. First, was 20 C.R.F. § 715.101(a)(27)[43] promulgated in accordance with the authority granted by law to the Secretary of Labor? Second, is a compensation award rendered by a person appointed pursuant to 20 C.F.R. § 715.101(a)(27) valid and enforceable? We answer yes to both questions and therefore reverse the order of the BRB and remand the causes for further consideration.
 
 
 114
 A. The Department of Labor Appropriations Acts
 
 
 115
 Initially, we note that our conclusion regarding this court's jurisdiction seemingly supports the BRB's Fields dictum that qualified administrative law judges were the only proper hearing officers for black lung cases. Although the BRB's resolution of the incorporation by reference problem rested upon an in pari materia analysis which we have found unpersuasive, the Board's ultimate conclusion regarding the incorporation of subsequent LHWCA amendments squares exactly with our own ruling. Nevertheless, we do not regard the result of our opinion in this respect as subject to inconsistency.
 
 
 116
 The simple fact is that Congress has enacted subsequent legislation pertaining to the § 19(d) hearing officer question while (unfortunately) leaving unaffected the LHWCA provisions pertaining to judicial review which have caused, because of their abysmally inept drafting, so many problems for the various circuits. Specifically, Congress has inserted in the last four Department of Labor Appropriation Acts a paragraph authorizing the Secretary to deviate from the LHWCA § 19(d) requirement of qualified administrative law judges.[44]
 
 
 117
 The Director argues that the promulgation of 20 C.F.R. § 715.101(a)(27) was fully consistent with the authority granted to the Secretary by P.L. 93-192 and the succeeding Departments of Labor, and HEW Appropriation Acts. He observes that the federal courts have frequently held that Congress may, if it chooses, amend substantive legislation by means of an appropriation bill. The respondents do not dispute Congressional power to amend or repeal earlier legislation by means of appropriation bills but instead center their argument on the legislative purpose underlying P.L. 93-192. Essentially, their argument is that the only "activities," see note 44 supra, to which the second paragraph refers are compensation benefits payable out of the public treasury. They insist that P.L. 93-192 and its successors authorize the Secretary to use nonqualified hearing officers only in processing claims for which the Department of Labor itself has the responsibility for paying benefits. Thus, the respondents read the appropriation acts as serving the narrow purpose of promoting the Secretary's "activities" in situations such as those delineated in § 424 of the amended (May 1972) FCMHSA, 30 U.S.C. § 934 (Supp. V, 1975), see note 30 supra, where no responsible operator can be identified.
 
 
 118
 The heart of the respondents' argument is that the relevant paragraph was not designed to apply to adversary proceedings involving employer liability. We reject that argument. Applying Hochfelder's requirement, 425 U.S. at 197, 96 S.Ct. 1375, that the construction of the appropriations acts should start with their language, we agree with the Director that the acts literally state that the Secretary may appoint individuals not qualified under 5 U.S.C. § 3105 to hear cases involving the payment of compensation, benefits, and expenses. It serves little purpose to set out in extenso the first paragraph of each of the appropriation acts. It is sufficient to note that the appropriation acts for 1974 and 1975 make a direct reference to the amended LHWCA § 44 (33 U.S.C. § 944). Adjudications involving the special LHWCA § 44 (33 U.S.C. § 944) fund have always involved, and now involve, the liability of a longshore employer as well as that of the fund. The acts for 1976 and 1977 make direct reference to compensation and benefits under § 10(h) of the amended (October 1972) LHWCA, 33 U.S.C. § 910(h) (Supp. V, 1975), subsection (2) of which itself makes a specific cross-reference to the section 944 fund.[45]
 
 
 119
 Inasmuch as § 44 of both versions of the LHWCA has consistently been excluded from the FCMHSA, we see little point in pursuing further the interplay of statutory sections. Our task at this point is merely to determine whether the respondents' reading of the appropriation acts plausibly establishes that Congress was promoting only the Secretary's "activities" regarding benefits wherein no adversarial proceeding was needed or contemplated. In pursuit of that narrow objective, we note that the language of § 44(j)(4) of the amended (October 1972) LHWCA, 33 U.S.C. § 944(j)(4) (Supp. V, 1975), makes a specific reference to the section 907 medical examinations which were first excluded from the FCMHSA in 1969 but deliberately incorporated in May 1972.[46] See notes 11, 12, 13 supra.
 
 
 120
 Because the respondents' narrow reading of the purposes of the appropriation acts cannot stand once their language is traced through all the labyrinthal statutory cross-references, we are constrained to agree with the Director that the authority contained in P.L. 93-192 and its successors amply supports the promulgation of the amended regulation.
 
 
 121
 Indeed, we note that the failure to promulgate a regulation such as 20 C.F.R. § 715.101(a)(27) would have brought the FCMHSA benefits program to a grinding halt and frustrated the Congressional intent that miners and their relatives receive benefits. Even if we regarded the respondents' reading of the appropriations acts as plausible, which we do not, we conclude that they have not overcome the presumptive validity of the contested regulation. See generally Northern Indiana Public Service Co. v. Porter County Chapter of the Izaak Walton League of America, Inc., 423 U.S. 12, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975); Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); Federal Communications Commission v. Schreiber, 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965); Gemsco, Incorporated v. Walling, Administrator of the Wage and Hour Division, U.S. Department of Labor, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945); Boske v. Comingore, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846 (1900); and Giancana v. Johnson, 335 F.2d 372 (7th Cir. 1964).
 
 B. Compliance With 5 U.S.C. § 559
 
 122
 The respondents contend that the language of the appropriation acts authorizing the Secretary to use nonqualified administrative law judges is inconsistent with the requirement of 5 U.S.C. § 559.[47] As previously noted, the BRB's Fields decision also invalidated the Secretary's regulation on the ground of conflict with 5 U.S.C. § 559. The respondents point out that the language of the appropriation acts does not expressly amend, modify, or supercede the Administrative Procedure Act. They interpret the second paragraph of the appropriation acts as authorizing the Secretary "to supercede the provisions of the APA as he sees fit." Correctly observing that such authorization is inconsistent with the language of § 559, they argue that Congress was required to adopt language stating in express terms that the respective sections of the APA were amended and superceded.
 
 
 123
 We agree with the Director that the language in the appropriation acts sufficiently establishes an express exemption from the provisions of the incorporated § 19(d) of the amended (October 1972) LHWCA, 33 U.S.C. § 919(d) (Supp. V, 1975), requiring qualified administrative law judges for the adjudication of claims. Although it might have been better draftsmanship to make specific reference to either LHWCA § 19(d) or 5 U.S.C. § 554, we think that the statutory language is sufficiently explicit as to meet the requirement of 5 U.S.C. § 559. We cannot agree with the respondents that the Secretary has unfettered discretion to supercede the formal requirements of the APA. Congress had earlier expressed its intent that hearings follow the provisions of 5 U.S.C. § 554. See note 2 supra. By virtue of that section's cross-reference to section 556, subsection (b) of the latter section would have allowed some flexibility regarding the presiding officer absent the specific requirement of 5 U.S.C. § 3105 qualification.[48] The second sentence of LHWCA § 19(d), 33 U.S.C. § 919(d) (Supp. V, 1975), was obviously intended to confine the choice of presiding officers to those specified in § 556(b)(3). When Congress formulated the paragraph subsequently set forth in all succeeding appropriation acts, it clearly did not authorize the Secretary to modify or supercede any of the provisions of §§ 554, 556, or 557 other than the § 19(d) limitation of proper officers to those specified in § 556(b)(3).
 
 
 124
 Thus the Secretary simply cannot be understood to possess authority to supercede the provisions of the APA as he sees fit. Moreover, his authorization to deviate from the use of § 3105 hearing officers operates only after a finding that the appointment of otherwise qualified persons would promote the achievement of the payment of compensation benefits. The modification or supersession of § 19(d) or § 554 requirements is a very limited one. The respondents' suggestion that § 559 was formulated in such a way as to place upon Congress the rigid requirement of making specific and numeric references to the APA would require holding that Congress can make limited modifications of APA procedures only by use of a particular form of legislative draftsmanship. We decline to intrude this court into the legislative process so extensively.
 
 
 125
 In view of our conclusion that the language of the appropriation acts covers adversarial proceedings and that the enactment of those acts did not contravene the requirements of § 559, it necessarily follows that the orders of the BRB must be set aside. Accordingly, the Director's petitions for review are granted, the BRB's orders are set aside, and the causes are remanded for resolution of any remaining legal or factual questions.
 
 
 126
 PETITIONS GRANTED, ORDERS SET ASIDE, AND CAUSES REMANDED.
 
 
 
 *
 For a discussion of the reasons why the Director is captioned as petitioner in these review petitions, see part II of the opinion
 
 
 **
 District Judge S. Hugh Dillin of the Southern District of Indiana is sitting by designation
 
 
 [1]
 In Usery v. Turner Elkhorn Mining Company, 428 U.S. 1, 8-10, 96 S.Ct. 2882, 2889, 49 L.Ed.2d 752 (1976), the Supreme Court summarized the distinct processing procedures for Part C and Part B claims, as follows:
 Under Part C of Title IV, §§ 421-431, 30 U.S.C. §§ 931-941 (1970 ed. and Supp. IV), claims filed after December 31, 1973, are to be processed under an applicable state workmen's compensation law approved by the Secretary of Labor under the standards set forth in § 421, 30 U.S.C. § 931 (1970 ed. and Supp. IV). In the absence of such an approved state program, and to date no state program has been approved, claims are to be filed with and adjudicated by the Secretary of Labor, and paid by the mine operators. § 422, 30 U.S.C. § 932 (1970 ed. and Supp. IV). Under § 422 an operator, who is entitled to a hearing in connection with these claims, is liable for Part C benefits with respect to death or total disability due to pneumoconiosis (black lung disease) arising out of employment in a mine for which the operator is responsible. The operator's liability for Part C benefits covers the period from January 1, 1974, to December 30, 1981. Payments of benefits under Part C are to the same categories of persons a miner or certain survivors and in the same amounts, as under Part B. §§ 422(c), (d); see § 412(a), 30 U.S.C. § 922(a) (1970 ed. and Supp. IV).
 Claims filed during the transition period between Federal Government benefit provision under Part B, and state plan or operator benefit provision under Part C that is, July 1 to December 31, 1973 (as in Vancil's filing) are adjudicated under § 415 of Part B, 30 U.S.C. § 925 (Supp. IV), by the Secretary of Labor. The United States is responsible for payment on these claims until December 31, 1973. Responsible operators, having been notified of a claim and entitled to participate in a hearing thereon, are thereafter liable for benefits as if the claim had been filed pursuant to Part C and § 422 had been applicable to the operator. (Footnote omitted.)
 
 
 [2]
 Section 19(d) of the Act, 33 U.S.C. § 919(d) (Supp. V, 1975), provides:
 Notwithstanding any other provisions of this chapter, any hearing held under this chapter shall be conducted in accordance with the provisions of section 554 of Title 5. Any such hearing shall be conducted by a hearing examiner (administrative law judge) qualified under section 3105 of that title. All powers, duties, and responsibilities vested by this chapter, on October 27, 1972, in the deputy commissioners with respect to such hearings shall be vested in such hearing examiners.
 
 
 [3]
 For the pertinent text of 5 U.S.C. § 559, see note 47 infra
 
 
 [4]
 The reported cases disclose that the question whether the Director is a proper petitioner remains unsettled. In large measure, the problem stems from the formulation of § 21(c) of the amended (October 1972) LHWCA, 33 U.S.C. § 921(c) (Supp. V, 1975). This opinion considers in part I whether the new formulation of § 21(c) is incorporated into the FCMHSA and treats the propriety of allowing the Director to file petitions for review in part II
 
 
 [5]
 Section 21(c) of the amended (October 1972) LHWCA, 33 U.S.C. § 921(c) (Supp. V, 1975), provides:
 Any person adversely affected or aggrieved by a final order of the Board may obtain a review of that order in the United States court of appeals for the circuit in which the injury occurred, by filing in such court within sixty days following the issuance of such Board order a written petition praying that the order be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court, to the Board, and to the other parties, and thereupon the Board shall file in the court the record in the proceedings as provided in section 2112 of Title 28. Upon such filing, the court shall have jurisdiction of the proceeding and shall have the power to give a decree affirming, modifying, or setting aside, in whole or in part, the order of the Board and enforcing same to the extent that such order is affirmed or modified. The orders, writs, and processes of the court in such proceedings may run, be served, and be returnable anywhere in the United States. The payment of the amounts required by an award shall not be stayed pending final decision in any such proceeding unless ordered by the court. No stay shall be issued unless irreparable injury would otherwise ensue to the employer or carrier. The order of the court allowing any stay shall contain a specific finding, based upon evidence submitted to the court and identified by reference thereto, that irreparable damage would result to the employer, and specifying the nature of the damage.
 
 
 [6]
 Section 415(a)(5) of the amended (May 1972) FCMHSA, 30 U.S.C. § 925(a)(5) (Supp. V, 1975), provides:
 Any operator who has been notified of the pendency of a claim under paragraph 4 of this subsection (the text of which is set forth in note 10 infra ) shall be bound by the determination of the Secretary of Labor on such claim as if the claim had been filed pursuant to part C of this subchapter and section 932 of this title had been applicable to such operator. Nothing in this paragraph shall require any operator to pay any benefits for any month prior to January 1, 1974.
 
 
 [7]
 For the text of this section, see note 12 infra. For the original text of § 422(a) of the FCMHSA of 1969, 30 U.S.C. § 932(a) (1970 ed.), see note 11 infra
 
 
 [8]
 Section 21 of the LHWCA, 33 U.S.C. § 921 (1970 ed.), provided:
 (a) A compensation order shall become effective when filed in the office of the deputy commissioner as provided in section 919 of this title, and, unless proceedings for the suspension or setting aside of such order are instituted as provided in subdivision (b) of this section, shall become final at the expiration of the thirtieth day thereafter.
 (b) If not in accordance with law, a compensation order may be suspended or set aside, in whole or in part, through injunction proceedings, mandatory or otherwise, brought by any party in interest against the deputy commissioner making the order, and instituted in the Federal district court for the judicial district in which the injury occurred (or in the United States District Court for the District of Columbia if the injury occurred in the District). The orders, writs, and processes of the court in such proceedings may run, be served, and be returnable anywhere in the United States. The payment of the amounts required by an award shall not be stayed pending final decision in any such proceeding unless upon application for an interlocutory injunction the court, on hearing, after not less than three days' notice to the parties in interest and the deputy commissioner, allows the stay of such payments, in whole or in part, where irreparable damage would otherwise ensue to the employer. The order of the court allowing any such stay shall contain a specific finding, based upon evidence submitted to the court and identified by reference thereto, that such irreparable damage would result to the employer, and specifying the nature of the damage.
 (c) If any employer or his officers or agents fails to comply with a compensation order making an award, that has become final, any beneficiary of such award or the deputy commissioner making the order, may apply for the enforcement of the order to the Federal district court for the judicial district in which the injury occurred (or to the United States District Court for the District of Columbia if the injury occurred in the District). If the court determines that the order was made and served in accordance with law, and that such employer or his officers or agents have failed to comply therewith, the court shall enforce obedience to the order by writ of injunction or by other proper process, mandatory or otherwise, to enjoin upon such person and his officers and agents compliance with the order.
 (d) Proceedings for suspending, setting aside, or enforcing a compensation order, whether rejecting a claim or making an award, shall not be instituted otherwise than as provided in this section and section 918 of this title.
 
 
 [9]
 Sections 21(a), (b), (d), and (e) of the amended (October 1972) LHWCA, 33 U.S.C. §§ 921(a), (b), (d), and (e) (Supp. V, 1975), provide:
 (a) A compensation order shall become effective when filed in the office of the deputy commissioner as provided in section 919 of this title, and, unless proceedings for the suspension or setting aside of such order are instituted as provided in subdivision (b) of this section, shall become final at the expiration of the thirtieth day thereafter.
 (b)(1) There is hereby established a Benefits Review Board which shall be composed of three members appointed by the Secretary from among individuals who are especially qualified to serve on such Board. The Secretary shall designate one of the members of the Board to serve as chairman.
 (2) For the purpose of carrying out its functions under this chapter, two members of the Board shall constitute a quorum and official action can be taken only on the affirmative vote of at least two members.
 (3) The Board shall be authorized to hear and determine appeals raising a substantial question of law or fact taken by any party in interest from decisions with respect to claims of employees under this chapter and the extensions thereof. The Board's orders shall be based upon the hearing record. The findings of fact in the decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole. The payment of the amounts required by an award shall not be stayed pending final decision in any such proceeding unless ordered by the Board. No stay shall be issued unless irreparable injury would otherwise ensure to the employer or carrier.
 (4) The Board may, on its own motion or at the request of the Secretary, remand a case to the hearing examiner for further appropriate action. The consent of the parties in interest shall not be a prerequisite to a remand by the Board.
 * * * (For the text of subsection (c), see note 5 supra.)
 (d) If any employer of his officers or agents fails to comply with a compensation order making an award, that has become final, any beneficiary of such award or the deputy commissioner making the order, may apply for the enforcement of the order to the Federal district court for the judicial district in which the injury occurred (or to the United States District Court for the District of Columbia if the injury occurred in the District). If the court determines that the order was made and served in accordance with law, and that such employer or his officers or agents have failed to comply therewith, the court shall enforce obedience to the order by writ of injunction or by other proper process, mandatory or otherwise, to enjoin upon such person and his officers and agents compliance with the order.
 (e) Proceedings for suspending, setting aside, or enforcing a compensation order, whether rejecting a claim or making an award, shall not be instituted otherwise than as provided in this section and section 918 of this title.
 
 
 [10]
 The parties' arguments concerning the merits devote some attention to § 415(a)(4) of the amended FCMHSA, 30 U.S.C. § 925(a)(4) (Supp. V, 1975), which provides:
 In determining such claims (Part B claims), the Secretary of Labor shall, to the extent appropriate, follow the procedures described in subsections (b), (c), and (d) of section 919 of Title 33. (Sections 19(b), (c) and (d) of Public Law 803, 69th Congress (44 Stat. 1424, approved March 4, 1927), as amended.)
 Plainly, not a single word in this incorporating section refers to the review procedures following the initial administrative hearing, all of which are controlled by section 21 of either the earlier or the amended formulation of the LHWCA. Thus, we need not consider, in the context of a ruling regarding our review jurisdiction, the incorporating effect of § 415(a)(4), 30 U.S.C. § 925(a)(4) (Supp. V, 1975).
 
 
 [11]
 Section 422(a) of the original FCMHSA, 30 U.S.C. § 932(a) (1970 ed.) provided:
 During any period after December 31, 1972, in which a State workmen's compensation law is not included on the list published by the Secretary under section 931(b) of this title, the provisions of Public Law 803, 69th Congress (44 Stat. 1424, approved March 4, 1927), as amended (other than the provisions contained in sections 1, 2, 3, 4, 7, 8, 9, 10, 12, 13, 29, 30, 31, 32, 33, 37, 38, 41, 43, 44, 45, 46, 47, 48, 49, 50, and 51 thereof) shall (except as otherwise provided in this subsection and except as the Secretary shall by regulation otherwise provide), be applicable to each operator of an underground coal mine in such State with respect to death or total disability due to pneumoconiosis arising out of employment in such mine. In administering this part, the Secretary is authorized to prescribe in the Federal Register such additional provisions, not inconsistent with those specifically excluded by this subsection, as he deems necessary to provide for the payment of benefits by such operator to persons entitled thereto as provided in this part and thereafter those provisions shall be applicable to such operator.
 
 
 [12]
 Section 422(a) of the amended (May 1972) FCMHSA, 30 U.S.C. § 932(a) (Supp. V, 1975), provides:
 During any period after December 31, 1973, in which a State workmen's compensation law is not included on the list published by the Secretary under section 931(b) of this title, the provisions of Public Law 803, 69th Congress (44 Stat. 1424, approved March 4, 1927), as amended (other than the provisions contained in sections 1, 2, 3, 4, 8, 9, 10, 12, 13, 29, 30, 31, 32, 33, 37, 38, 41, 43, 44, 45, 46, 47, 48, 49, 50, and 51 thereof) shall (except as otherwise provided in this subsection and except as the Secretary shall by regulation otherwise provided (sic)), be applicable to each operator of a coal mine in such State with respect to death or total disability due to pneumoconiosis arising out of employment in such mine. In administering this part, the Secretary is authorized to prescribe in the Federal Register such additional provisions, not inconsistent with those specifically excluded by this subsection, as he deems necessary to provide for the payment of benefits by such operator to persons entitled thereto as provided in this part and thereafter those provisions shall be applicable to such operator.
 
 
 [13]
 In Usery, supra, 428 U.S. at 9 n.8, 96 S.Ct. at 2889 n.8, the Supreme Court expressly noted this change, stating: "See § 422(a), 30 U.S.C. § 932(a) (Supp. IV), incorporating 33 U.S.C. § 907 (Supp. IV)." Mr. Justice Marshall's use of the "Supp. IV" citation form for the incorporated provision from LHWCA may suggest the Supreme Court has impliedly ruled that the May 1972 amendments adopted the LHWCA provisions as subsequently amended. We decline, however, to attach that much significance to the citation of the fourth supplement to the 1970 edition of the United States Code. We do not read Usery as qualifying or questioning the Kendall case, supra, which initially formulated for the federal courts a canon of construction which necessarily plays a central role in the instant cases. Clearly, Usery does not question nor mention In re Heath, 144 U.S. 92, 12 S.Ct. 615, 36 L.Ed. 358 (1892), a case which formally approved and followed Kendall
 
 
 [14]
 In this respect, it makes little difference what position one takes on the question of the incorporation of prior or subsequent LHWCA provisions. Section 4 of the Longshoremen's Act has never been amended. It provides that every employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 907, 908, and 909 (sections 7, 8, and 9) of the title. Section 5 of the Act, in both its earlier and amended versions, deals with the important substantive requirement making liability exclusive. The first twenty-eight words of both versions are exactly identical, providing that "(t)he liability of an employer prescribed in section 904 (section 4) of this title shall be exclusive and in place of all other liability of such employer to the employee." By incorporating section 5 Congress appears to be saying that employers are entitled to the exclusivity benefit under appropriate conditions. However, mine operators can have no "prescribed section 904 (section 4) liability" by virtue of its explicit exclusion from both the original and reformulated black lung legislation
 
 
 [15]
 We have no way of knowing whether the legislative intent was to provide for additional provisions "not inconsistent with those not specifically excluded" by the subsection, but do have difficulty in discerning any reasonable rationale for authorization of additional provisions on the basis that they not conflict with provisions which are not included in the statute as it would stand post-reference
 
 
 [16]
 "In the case at bar the whole scheme of procedure used in the cities is clearly adopted. The words of the statute and the text of the note appended to the bill by the revisor indicate that it is the general law on the subject of sewer assessments that is adopted. This being so, the fact that the law is referred to also in terms of the sections of the statutes in which it is to be found is not considered sufficient to make it an adoption of just one particular statute." 242 Wis. at 317, 7 N.W.2d at 894
 
 
 [17]
 For a list of those cases, see note 39 infra
 
 
 [18]
 For the text of this section, see note 2 supra
 
 
 [19]
 For the text of this section, see note 43 infra
 
 
 [20]
 Section 415(b) of the amended (May 1972) FCMHSA, 30 U.S.C. § 925(b) (Supp. V, 1975), provides:
 The Secretary of Labor, after consultation with the Secretary of Health, Education, and Welfare, may issue such regulations as are necessary or appropriate to carry out the purpose of this section.
 
 
 [21]
 For the text of this section, see note 12 supra
 
 
 [22]
 Section 426(a) of the amended (May 1972) FCMHSA, 30 U.S.C. § 936(a) (1970 ed. and Supp. V, 1975), provides:
 The Secretary of Labor and the Secretary of Health, Education, and Welfare are authorized to issue such regulations as each deems appropriate to carry out the provisions of this subchapter. Such regulations shall be issued in conformity with section 553 of Title 5, notwithstanding subsection (a) thereof.
 
 
 [23]
 For the text of this section, see note 26 infra
 
 
 [24]
 For the text of this section, see note 27 infra
 
 
 [25]
 Section 421(b)(1) of the amended (May 1972) FCMHSA, 30 U.S.C. § 931(b)(1) (1970 ed. and Supp. V, 1975), provides:
 For purposes of this section, a State workmen's compensation law shall not be deemed to provide adequate coverage for pneumoconiosis during any period unless it is included in the list of State laws found by the Secretary to provide such adequate coverage during such period. The Secretary shall . . . publish in the Federal Register a list of State workmen's compensation laws which provide adequate coverage for pneumoconiosis and shall revise and republish in the Federal Register such list from time to time, as may be appropriate to reflect changes in such State laws due to legislation or judicial or administrative interpretation. (Emphasis supplied.)
 
 
 [26]
 Section 421(b)(2)(F) of the amended (May 1972) FCMHSA, 30 U.S.C. § 931(b) (2)(F) (1970 ed. and Supp. V, 1975), in pertinent part, provides:
 The Secretary shall include a State workmen's compensation law on such list (i. e., that published or republished in the Federal Register) during any period only if he finds that during such period under such law
 (F) there are applicable such other provisions, regulations or interpretations, which are consistent with the provisions contained in Public Law 803, 69th Congress (44 Stat. 1424, approved March 4, 1927), as amended, which are applicable under section 932(a) of this title, but are not inconsistent with any of the criteria set forth in subparagraphs (A) through (E) of this paragraph, as the Secretary, in accordance with regulations promulgated by him, determines to be necessary or appropriate to assure adequate compensation for total disability or death due to pneumoconiosis.
 
 
 [27]
 Section 18(b) of the LHWCA, 33 U.S.C. § 918(b) (1970 ed. and Supp. V, 1975), provides:
 In cases where judgment cannot be satisfied by reason of the employer's insolvency or other circumstances precluding payment, the Secretary of Labor may, in his discretion and to the extent he shall determine advisable after consideration of current commitments payable from the special fund established in section 944 of this title, make payment from such fund upon any award made under this Act, and in addition, provide any necessary medical, surgical, and other treatment required by section 907 of this title in any case of disability where there has been a default in furnishing medical treatment by reason of the insolvency of the employer. Such an employer shall be liable for payment into such fund of the amounts paid therefrom by the Secretary of Labor under this subsection; and for the purpose of enforcing this liability, the Secretary of Labor for the benefit of the fund shall be subrogated to all the rights of the person receiving such payment or benefits, including the right of lien and priority provided for by section 917 of this title, of this Act, as against the employer and may by a proceeding in the name of the Secretary of Labor under section 918 of this title or under subsection (c) of section 921 of this title, or both, seek to recover the amount of the default or so much thereof as in the judgment of the Secretary is possible, or the Secretary may settle and compromise any such claim. (Emphasis supplied.)
 
 
 [28]
 Because both versions of the incorporating clause of the FCMHSA expressly exclude § 44 of the LHWCA from the black lung legislation, as the text infra points out, we deem it unnecessary to set forth a specific edition of the United States Code. See note 29 infra. Nor is the exact text of that statutory section of crucial relevance to the jurisdictional question
 
 
 [29]
 The LHWCA § 44 (33 U.S.C. § 944) special fund has been aptly paraphrased as "the second-injury special fund." See Atlantic & Gulf Stevedores v. Director, Office of Workers' Compensation Programs, United States Department of Labor, 542 F.2d 602, 606 (3rd Cir. 1976). This characterization rests upon the cross-reference between old LHWCA §§ 44(a) and 8(f). Until October 1972, the language of § 44(a) contained a direct cross-reference. The Supreme Court explained briefly the relationship in Lawson v. Suwannee Fruit & Steamship Co., 336 U.S. 198, 69 S.Ct. 503, 93 L.Ed. 611 (1949). We deem it unnecessary at this point to discuss the possible implications arising from the deletion of all specific cross-references from the old § 44(a) subsection by the October 1972 amendments. Compare § 44(a) of the LHWCA, 33 U.S.C. § 944(a) (1970 ed.), with § 44(a) of the amended (October 1972) LHWCA, 33 U.S.C. § 944(a) (Supp. V, 1975)
 
 
 [30]
 Section 424 of the original (December 1969) FCMHSA, 30 U.S.C. § 934 (1970 ed.) provided:
 If a totally disabled miner or a widow is entitled to benefits under section 932 of this title and (1) an operator liable for such benefits has not obtained a policy or contract of insurance, or qualified as a self-insurer, as required by section 933 of this title, or such operator has not paid such benefits within a reasonable time, or (2) there is no operator who was required to secure the payment of such benefits, the Secretary shall pay such miner or such widow the benefits to which he or she is so entitled. In a case referred to in clause (1), the operator shall be liable to the United States in a civil action in an amount equal to the amount paid to such miner or his widow under this subchapter.
 Section 424 of the amended (May 1972) FCMHSA, 30 U.S.C. § 934 (Supp. V, 1975), provides:
 If a totally disabled miner or a widow, child, parent, brother, or sister is entitled to benefits under section 932 of this title and (1) an operator liable for such benefits has not obtained a policy or contract of insurance, or qualified as a self-insurer, as required by section 933 of this title, or such operator has not paid such benefits within a reasonable time, or (2) there is no operator who was required to secure the payment of such benefits, the Secretary shall pay such miner or such widow, child, parent, brother, or sister the benefits to which he or she is so entitled. In a case referred to in clause (1), the operator shall be liable to the United States in a civil action in an amount equal to the amount paid to such miner or his widow, child, parent, brother, or sister under this subchapter.
 
 
 [31]
 20 C.F.R. § 725.333(b) provides:
 In cases where judgment cannot be satisfied by reason of an insolvency or other circumstances precluding payment, the Secretary shall make payment pursuant to section 424 of Part C of Title IV of the Act upon any award made under this act, and in addition, provide any necessary medical, surgical, and other treatment required by section 7 of the Longshoremen's Act in any case of disability where there has been a default in furnishing medical treatment by reason by (sic: of) the insolvency of the operator. Such an operator shall be liable to the United States for payment of the amounts paid by the Secretary of Labor under this subsection; and for the purpose of enforcing this liability, the Secretary shall be subrogated to all the rights of the person receiving such payments or benefits, including the right of lien and priority provided for by section 17 of the Longshoremen's Act, as against the operator and may by a proceeding in the name of the Secretary of Labor under section 18 or under subsection (c) of section 21 of the Longshoremen's and Harbor Workers' Compensation Act, or both, seek to recover the amount of the default or so much thereof as in the judgment of the Secretary is possible, or the Secretary may settle and compromise any such claim. (Emphasis supplied.)
 
 
 [32]
 For the exact statutory language of new subsection (d), see note 9 supra. For the text of old subsection (c), see note 8 supra. Similarly, by virtue of the October 1972 amendments, the old subsection (d), see note 8 supra, became the new subsection (e). Compare note 8 supra, with note 9 supra
 
 
 [33]
 Fed.R.App.P. 15(a), in pertinent part, provides:
 In each case the agency shall be named respondent.
 
 
 [34]
 Section 21a of the amended (October 1972) LHWCA, 33 U.S.C. § 921a (Supp. V, 1975), provides:
 Attorneys appointed by the Secretary shall represent the Secretary, the deputy commissioner, or the Board in any court proceedings under section 921 of this title or other provisions of this chapter except for proceedings in the Supreme Court of the United States.
 
 
 [35]
 20 C.F.R. § 725.402(d) provides:
 The Benefits Review Board is that body appointed by the Secretary pursuant to section 21(b) of the Longshoremen's and Harbor Workers' Compensation Act as amended in 1972, which is empowered to hear and determine finally for the Department of Labor appeals raising a substantial question of law or fact taken by any party in interest from decisions and order (sic) of any duly authorized Department of Labor official or administrative law judge with respect to any claim for black lung benefits . . . .
 
 
 [36]
 Ordinarily, the question has been presented by a motion to dismiss the BRB as respondent and to substitute the Director. We note that in Stockman v. John T. Clark & Son of Boston & American Mutual Liability Ins. Co., Employer/Carrier, 539 F.2d 264 (1st Cir. 1976), cert. filed, 45 U.S.L.W. 3332 (October 22, 1976) (No. 571), the court avoided the problem by designating the Director as "Party in Interest."
 
 
 [37]
 We note that the en banc majority discussed the significance of 33 U.S.C. § 921a. To that extent, it met the earlier criticism of Judge Friendly, who had pointedly noted that "(n)either the McCord nor the I.T.O. court (panel) discussed § 921a. . . ." Pittston, supra, 544 F.2d at 42 n.5
 
 
 [38]
 We think it reasonable to assume that counsel for Ayers Steamship Company had located during his research the ruling by the original I.T.O. panel that neither the BRB nor the Director was a proper respondent but that it would "treat their (counsel for the government) participation, however, as amicus curiae." 529 F.2d at 1080, 1089
 
 
 [39]
 We note that this situation may change. In connection with an earlier motion to expedite this appeal, the Director indicated that he has filed seven other petitions challenging BRB orders vacating, as here, the orders entered by hearing officers who are not qualified under 5 U.S.C. § 3105, viz.: Director, OWCP v. Rochester and Pittsburgh Coal Company, No. 76-1828 (3d Cir., filed June 28, 1976); Director, OWCP v. Rochester and Pittsburgh Coal Company, No. 76-1868 (3d Cir., filed July 7, 1976); Director, OWCP v. National Mines Corporation, No. 76-1694 (4th Cir., filed June 28, 1976); Director, OWCP v. Island Creek Coal Company, No. 76-1731 (4th Cir., filed July 8, 1976); Director, OWCP v. Alabama By-Products Corporation, No. 76-2549 (5th Cir., filed June 4, 1976); Director, OWCP v. Eastern Coal Corporation, No. 76-1895 (6th Cir., filed July 6, 1976); and Director, OWCP v. Elkhorn-Jellico Coal Company, No. 76-1896 (6th Cir., filed July 6, 1976). Assuming that in those cases, as here, the claimants have not filed petitions for review, four other circuits have been confronting the question whether the Director, absent participation by the claimants, can be allowed to appear as a party-petitioner. As the text points out, the Third Circuit's disposition of the first two review petitions has not supported the Director's position
 
 
 [40]
 The Rochester Coal Company panel purported to confine its ruling only to the standing question, reserving the question of the BRB's jurisdiction. Slip op. at 10 n.7. Our holding as to this court's review jurisdiction necessarily carries with it a ruling as to the BRB's jurisdiction. See note 42 infra
 
 
 [41]
 This opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing in banc on the position taken in this opinion on the questions presented in these cases as to the status of the Director as a party-petitioner
 
 
 [42]
 We deem it unnecessary to discuss the question of the BRB's jurisdiction. Our conclusion that § 422(a) of the amended (May 1972) FCMHSA, 30 U.S.C. § 932(a) (Supp. V, 1975), constitutes a general reference, which has the legal effect of incorporating the subsequent amendments to the LHWCA, necessarily disposes of that question
 
 
 [43]
 20 C.F.R. § 715.101(a)(27) provides:
 "Hearing Officer" means a hearing officer appointed by the Secretary of Labor to conduct formal hearings in respect of claims for benefits under section 415 and Part C of the Act. Wherever the term "administrative law judge" appears in this part or Parts 718, 720 or 725 of this chapter, such term shall have the same meaning as the term "hearing officer." Such hearing officers may or may not meet the requirements for hearing examiners appointed under 5 U.S.C. 3105 but shall, in the opinion of the Secretary, be qualified to carry out the responsibilities and follow the procedures prescribed for administrative law judges by this part and Parts 718, 720, and 725 of this chapter. Hearing officers shall to the extent possible conduct all formal proceedings over which they preside in accordance with the applicable provisions of the Administrative Procedures Act, 5 U.S.C. 554, et seq. as such provisions are interpreted by Parts 720 and 725 of this chapter. Hearing officers shall be organizationally placed in the Office of Administrative Law Judges and shall be under the direct supervision of the Chief Administrative Law Judge of the Department of Labor, Washington, D.C. 20210.
 
 
 [44]
 The relevant paragraph reads as follows:
 Whenever the Secretary of Labor finds it will promote the achievement of the above activities, qualified persons may be appointed to conduct hearings thereunder without meeting the requirements for hearing examiners appointed under 5 U.S.C. 3105: Provided, That no person shall hold a hearing in any case with which he has been concerned previously in the administration of such activities. (Emphasis supplied.)
 This paragraph appears verbatim in the Departments of Labor, and Health, Education, and Welfare Appropriation Act, 1974, P.L. 93-192, 87 Stat. 748; Departments of Labor, and Health, Education, and Welfare Appropriation Act, 1975, P.L. 93-517, 88 Stat. 1636; Departments of Labor, and Health, Education, and Welfare Appropriation Act, 1976, P.L. 94-206, 90 Stat. 7; and Departments of Labor, and Health, Education, and Welfare Appropriation Act, 1977, P.L. 94-439, 90 Stat. 1421. Presumably, such language will not appear in future appropriation acts. On October 15, 1976, President Ford signed P.L. 94-504, passed by the Congress on October 1, 1976, which reads as follows:
 Be it resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That qualified individuals appointed by the Secretary of Labor may hear and determine claims for benefits under part C of title IV of the Federal Coal Mine Health and Safety Act of 1969 and under section 415 of such Act. For purposes of this Joint Resolution, the term "qualified individual" means such an individual, regardless of whether that individual is a hearing examiner appointed under section 3105 of title 5, United States Code. Nothing in this Joint Resolution shall be deemed to imply that there is or is not in effect any authority for such individuals to hear and determine such claims under any provision of law other than this Joint Resolution.
 
 
 [90]
 Stat. 2428. The final sentence of the joint resolution was included in order not to assert a Congressional view on the legal question raised in the review petitions presented in five circuits
 
 
 [45]
 Section 10(h)(2) of the amended (October 1972) LHWCA, 33 U.S.C. § 910(h) (2) (Supp. V, 1975), provides:
 Fifty per centum of any additional compensation or death benefit paid as a result of the adjustment required by paragraphs (1) and (3) of this subsection shall be paid out of the special fund established under section 944 of this title, and 50 per centum shall be paid from appropriations.
 
 
 [46]
 Section 44(j)(4) of the amended (October 1972) LHWCA, 33 U.S.C. § 944(j) (4) (Supp. V, 1975), provides:
 To defray the expense of making examinations as provided in section 907 of this title.
 
 
 [47]
 5 U.S.C. § 559 (1970 ed. and Supp. V, 1975), in pertinent part, provides:
 Subsequent statute may not be held to supersede or modify this subchapter, chapter 7, sections 1305, 3105, 3344, 4301(2)(E), 5362, or 7521 of this title, or the provisions of section 5335(a)(B) of this title that relate to hearing examiners, except to the extent that it does so expressly. (Emphasis supplied.)
 
 
 [48]
 5 U.S.C. § 556(b) (1970 ed. and Supp. V, 1975), provides:
 There shall preside at the taking of evidence
 (1) the agency;
 (2) one or more members of the body which comprises the agency; or
 (3) one or more hearing examiners appointed under section 3105 of this title. (Emphasis supplied.)